G. & A. BOOKS, INC., 250 Book Center, Inc., Courageous Books, Inc., and M.J.M. Exhibitors, Inc., Plaintiffs,

v.

William J. STERN, individually and as Chairman of the New York State Urban Development Corporation, William H. Daly, individually and as Director of the Office of Midtown Enforcement of the City of New York, Steven Spinola, individually and as President of the Public Development Corporation of the City of New York, Herbert J. Sturz, individually and as Chairman of the City Planning Commission of the City of New York, Edward I. Koch, individually and as Mayor of the City of New York, The City of New York, Park Tower Realty Corp., Planning Innovations, Inc., Tishman Speyer Properties and Equitable Life Assurance Society of the United States, Defendants.

No. 84 Civ. 7565 (CBM).

United States District Court, S.D. New York.

Feb. 5, 1985.

Ralph J. Schwarz, Jr., New York City, for plaintiff.

Leahey & Johnson, P.C. by Peter James Johnson, New York City, for defendant Stern.

Frederick A.O. Schwartz, Jr., Corp. Counsel by Gary Schuller, New York City, for defendants Daly, Spinola, Sturz, Koch, and City of New York.

Paul, Weiss, Rifkind, Wharton & Garrison by Martin Flumenbaum, New York City, for defendants Tishman Speyer Properties and Equitable Life Assur. Soc. of the U.S.

Shea & Gould by Dean G. Yuzek, New York City, for defendant Park Tower Realty Corp.

Demov, Morris, Levin & Shein by Robert Hammerling, New York City, for defendant Planning Innovations, Inc.

## OPINION

MOTLEY, Chief Judge.

Plaintiffs, all in the business of selling and exhibiting sexually-explicit books, films and performances, sue to enjoin the destruction of their businesses by the Forty-Second Street Development Project. Plaintiffs claim that one of the motivations behind the Project, which will attempt to upgrade the Times Square area by building four large office towers, a hotel, and a merchandise mart, is to put them out of business and stifle distribution of sexually explicit, constitutionally protected material. They maintain that the Project's blight findings with regard to adult uses are inadequate, that the Project constitutes a prior restraint, that it violates the First Amendment and the Equal Protection Clause by in effect zoning retroactively on the basis of content, and that the Project fails to use the least restrictive means in furthering whatever legitimate goals it *does* have. Plaintiffs seek a preliminary injunction to stop the planned condemnation of the buildings on Forty-Second Street in which their businesses operate.

Defendants, myriad city and state officials with responsibility for the Project, and the private developers, respond that the Project is fully justified by the blight findings already made, that sexually explicit speech is not being singled out, that plaintiffs will not be denied access to the Project's new commercial locations, and that even if they were, it would not give rise to a constitutional claim. Defendants move to dismiss on the merits and on the doctrines of abstention and comity. In addition, the private developer defendants argue that they are not proper parties to this action.[1]

The case at bar requires the court to reconcile two broad strains of recent constitutional law. On the one hand, it has long been settled that the political branches of government have broad latitude in land use planning. *See Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954). The Supreme Court has in recent years stressed that this deference extends to the role of local government both in formulating goals for planning and in devising means within the state's police power to attain those goals. *See Hawaii Housing Authority v. Midkiff,* —— U.S. ——, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984); *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). Indeed, this flexibility is necessary if government is to formulate and implement creative solutions to blight, crime, pollution, and other problems related to land use.

■ On the other hand, this deference must give way in the face of a substantial claim of infringement on a constitutionally protected right. For example, the federal courts have exhibited an increasing sensitivity to the negative impact of ostensibly neutral city planning devices on constitutionally protected speech. They have refused to defer completely to local government and instead have scrutinized both the ends and means of regulation to determine

if it is unconstitutionally suppressive of speech. *See Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981); *Young v. American Mini Theatres,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). It is a deep tradition in First Amendment law that government may not escape scrutiny of its attempts to suppress speech merely by labelling its action as neutral regulation; it is the operation and effect of government action, not its form, that matters. *Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 708, 51 S.Ct. 625, 628, 75 L.Ed. 1357 (1931).

■ In light of this potential conflict between important constitutional values, the extreme positions staked out by plaintiffs and defendants in this case are not particularly helpful. Plaintiffs urge the easy to grasp but logically flawed proposition that any government regulation which has the effect of curtailing speech is perforce an unconstitutional prior restraint. It is obvious, however, that countless forms of government activity, from taxation to regulatory enforcement to criminal prosecutions, may limit the exercise of speech rights. The question is whether the government restriction is *content-based* or singles out speech activities for special burdens, or if the effect on speech is merely incidental to a legitimate and neutrally enforced regulatory scheme. This inquiry nevertheless requires a closer examination of government ends and means than would be permitted under the extremely deferential due process approach urged by defendants.

Having made this examination, the court concludes that plaintiffs have failed to meet their burden in justifying a preliminary injunction, that there are no material facts in dispute, and that defendants are entitled to judgment as a matter of law. In reaching these conclusions, the court

---

1. A hearing was held on plaintiffs' motion for preliminary injunction and defendants' motion to dismiss on December 12, 1984. Since both sides presented, and referred to in argument, extensive factual material beyond the com-

plaint, and since the parties had the opportunity to present any other relevant factual material, the court will treat defendants' motion as one for summary judgment.

makes the following findings of fact and conclusions of law.

FINDINGS OF FACT:

The Forty-Second Street Development Project is a large-scale redevelopment scheme jointly undertaken by the City and the State which would dramatically alter the physical, social, and cultural environment of the Times Square area. The Project emerged after years of false starts and failed initiatives by public officials seeking to bring renewal to Forty-Second Street. The present plan is the product of a lengthy, statutorily mandated land use review procedure which included extensive public hearings and resulted in hundreds of pages of detailed findings on the Project's impact. Even a brief, partial summary of these proceedings and findings is sufficient for this court to conclude that substantial and important public purposes underlie the Project.

The present initiative in Times Square was launched on June 27, 1980 with a Memorandum of Understanding between the City and the State's Urban Development Corporation (UDC). The Memorandum provided that the City and the UDC would jointly prepare a plan and designate a developer, and that the UDC would have primary responsibility for implementation of the plan. Following technical studies, the City and the UDC jointly issued a report in February 1981 entitled "Forty-Second Street Development Project: A Discussion Document," which described the potential Project's goals and possible boundaries. In June 1981, the City and the UDC issued joint Design Guidelines and a formal Request for Proposals. Following the submission in September 1981 of responses from private developers, conditional designations were made of developers for the construction and operation of four office towers, a merchandise mart, a hotel, and renovated theaters in the Project. *See* Affidavit of Defendant Herbert Sturz at 2–4.

In November 1982, the UDC formed the Times Square Redevelopment Corporation as its subsidiary and entrusted it with the primary responsibility for the development of Times Square. Working with the City, the TSRC formulated the details of the current Forty-Second Street Development Project. A draft environmental impact statement was prepared and circulated pursuant to state law, and public hearings were held at Town Hall in Manhattan in March, April, and September of 1984. Scores of public officials, property owners, local residents, and other members of the public testified and submitted written comments on the Project. The Final Environmental Impact Statement (FEIS) was issued in August 1984, and following the receipt of additional public comment, the final document was approved by the UDC's Board of Directors on October 4, 1984. The Board also adopted findings pursuant to the State's Eminent Domain Procedure Law. *Id.* at 4–5.

In accordance with the original Memorandum of Understanding, the Project was submitted to the City's Board of Estimate, which held a public hearing on October 25 and November 8, 1984 and then unanimously approved the plan. The UDC officially published its findings on November 15 and 16, 1984, and intends to proceed with condemnation of property in the Project area as soon as preliminary procedures are completed. *Id.* at 5.

The FEIS is the primary document containing the factual basis for the Project. It reviews in detail present problems in Times Square and assesses the Project's probable impact in several areas: land use and community resources, social and street conditions, historic resources, economic resources, traffic and transportation, air quality, noise levels, water resources, waste disposal, and energy resources. It should be noted that, by and large, plaintiffs do not challenge the essential factual content of the FEIS, but merely seek to interpret it differently than do defendants. The following factual findings, which are only highlights of some of the most pertinent parts of the FEIS, do not appear to be disputed and are adopted by the court.

The FEIS finds that the 13-acre Project area, which includes Forty-Second Street

from Broadway to Eighth Avenue and parts of the adjacent blocks on Forty-First and Forty-Third Streets, suffers from severe physical and social blight including decaying and underutilized buildings, depressed property values and tax revenues, drug dealing, violent crime, loitering, and prostitution.

Specifically, the FEIS finds that the land use potential of the Times Square area is dramatically unfulfilled. At present, only 24 to 34 percent of the potential zoning capacity has been built, and approximately 16 percent of the Project area is devoted solely to surface parking lots. FEIS at 2–7. Twenty percent of all space in the area, and 34 percent of commercial and office space, is vacant. *Id.* at 2–13. Many buildings in the area are decaying and obsolete and most are too small to meet modern business needs. *Id.* at 2–13–17. No new major construction has taken place in the Project area in 50 years. *Id.* at 1–4. In addition, "fragmented" diversity of ownership makes private attempts at redevelopment difficult. *Id.* at 2–17.

The FEIS reports that only about 4,000 people work within the entire Project area. By comparison, between 4,000 and 5,000 people would be employed in one 1,000,000 square foot office building. FEIS Executive Summary at S–8. The area is expected to generate approximately $5.4 million in property taxes in 1984–85. A single building located a block away from the area, the New York Telephone Building, is expected to generate $6.2 million in the same period. *Id.*

The Project, by consolidating land ownership and developing four large office towers, a hotel, and a merchandise mart, is expected to generate at least $776 million in taxes and payments to the city between 1983 and 2005, compared to an estimated maximum of $123 million if the Project were not built. In addition, at least $40 million will be contributed by developers for theater renovation and subway improvements, and 21,000 jobs will be added to the Project area. *Id.* at S–13. The Project also seeks to preserve a part of the area's history through the preservation of the architecturally significant theaters on 42nd Street.

Plaintiffs have made much of the statement within the FEIS that problems of physical blight are "no more than a backdrop" for the social problems of Times Square, arguing that this proves that the Project's justification rests largely on the eradication of adult uses. However, the foregoing facts demonstrate that physical blight and underutilization are a serious problem in Times Square and an important target of the Project. Moreover, examined in context, the quoted line clearly refers to physical blight as "no more than a backdrop" only in the sense that social conditions are what primarily cause people to be uncomfortable on the street in Times Square. *Id.* at 2–56. Nowhere does the FEIS suggest that physical blight is not an important independent problem.

The FEIS does find, however, that these unpleasant and frightening street conditions also stand in the way of Times Square's commercial and cultural renewal. The Midtown South police precinct, which includes the Project area, ranked first in felony complaints for the entire city for each of the last six years. FEIS at 2–81. Despite success by the police at curbing or at least displacing female prostitution in the area, and police sweeps which have reduced street crime levels temporarily, the blocks within the Project remain favorites for drug dealers, male prostitutes, and muggers. *Id.* at 2–87–89.

Beyond crime, the FEIS finds that several factors contribute to a generally tawdry and unpleasant ambiance in the Project area which discourages development and attendance in Times Square by many sectors of the public. The wide, overhanging movie marquees on Forty-Second Street provide a natural shelter for the assortment of drug pushers, three-card Monte dealers, chain snatchers, alcoholics, homeless people, and general loiterers who make up the permanent population of Times Square. While many of these people engage in no criminal activity and are victims

rather than victimizers, the FEIS concludes that the total ambiance on the street is frightening to passers-by. *Id.* at 2–57–58, 75. In addition, reported crimes in the theaters themselves are frequent. *Id.* at 2–57.

Adult bookstores, such as those operated by plaintiffs, are said to contribute to the general street ambiance because of two characteristics. First, most adult uses have either opaque windows or window displays which nevertheless obscure the view in and out of the store. This provides a measure of privacy for customers, but also discourages "eyes on the street" interaction between businesses and their blocks, which is thought to discourage crime and loitering. Second, since customers seeking sexually explicit material are said to "hurry in and out", the sidewalks outside of these stores are left free for loiterers. *Id.* at 2–58. The FEIS nowhere suggests that crime is *caused* by adult book stores, merely that the presence of such establishments, particularly those that are poorly maintained, contributes to the overall tawdry ambiance and provides a place where loitering can take place. *Id.*

Plaintiffs argue that since the FEIS does not specifically include plaintiffs' storefronts in its brief description of favorite "hang-out" spots for loiterers, *id.* at 2–79, the FEIS has failed to support any connection between plaintiffs and loitering. However, a careful reading of the FEIS section on loitering, *id.* at 2–75–80, reveals that Forty-Second Street between Seventh and Eighth Avenues—the core block of the Project and the location of plaintiffs' stores and many other adult uses—is a major center for loiterers.

Although the FEIS only includes adult uses as one of many contributors to the atmosphere of Times Square—along with pinball arcades, fast food restaurants, and bars—the document is replete with negative statements about such uses and a significant amount of space is devoted to cataloguing adult establishments. *See id.* at 2–59–61. Plaintiffs argue that since the FEIS fails to establish that adult uses in

and of themselves are a major cause of blight or crime in Times Square, the attention given to adult uses proves that defendants are motivated by hostility towards the content of plaintiff's materials and that a major goal of the Project is to eradicate pornography.

Plaintiffs are correct that the Project's planners have displayed a pronounced hostility to adult uses that appears to reflect official City and State policy. Nine pages of the FEIS are devoted to assessing the possibilities for relocation of adult uses, *id.* at 2–103–12, as opposed to one full page devoted to the possible relocation of crime from the Project area. *Id.* at 2–117–18. The FEIS presents as a "worst case scenerio" the possibility that all the present adult uses in the Project area would seek to relocate elsewhere in the city, *id.* at 2–103, and states with apparent pride that there will be no sex-related uses in the Project after completion. *Id.* at 2–95. The FEIS Executive Summary describes the negative impact that a new concentration of adult uses would have on the northern Times Square area. *Id.* at S–12. In addition, the FEIS reports with approval that the City's Office of Midtown Enforcement (OME), which is devoted to curbing such illegal activities as obscenity and prostitution, was successful in reducing adult uses in midtown Manhattan from 132 to 65 between January 1979 and December 1983. *Id.* at 2–92.

The FEIS's section on mitigation of the impact of the Project outlines legal methods, such as criminal enforcement and code compliance inspections, that the city will use to make sure that relocated adult uses are conducted lawfully. *Id.* at 5–7. However, the FEIS makes it clear that the government's policy is to discourage adult uses from relocating at all. The FEIS notes that administrative interpretations of current zoning limit establishments with four or more coin operated machines to a few specified amusement zones outside of Manhattan. If pending court challenges to this zoning are successful, the FEIS reports, the City will be limited in its ability

"to prevent, through zoning, the re-opening of peep shows." *Id.* at 5–8. Plaintiffs argue that since their businesses cannot survive economically with fewer than four machines, this zoning would in effect ban them from the borough once they are displaced.

In addition, the FEIS describes the city's policy of working with merchant and civic groups to discourage landlords from renting to adult uses, *id.* at 5–9, and congratulates the OME for its success in bringing a "legitimate restaurant (the Barking Fish) to a former adult use site." *Id.* at 1–20–21. The foregoing represents just a brief sampling of the negative statements about adult uses with which the FEIS and other Project documents are rife.

Nevertheless, government officials now insist that the Project and the City are neutral as to lawful adult uses, and that no discriminatory restrictions will be placed on the ability of sex-related businesses to relocate in the finished Project area. *See, e.g.,* Affidavit of Herbert Sturz at 2; affidavit of William J. Stern at 3. Defendants seek to characterize statements in the FEIS and elsewhere that there will be no adult uses in the completed Project as mere predictions of what market forces will produce in the upscaled Project. Transcript of oral argument at 30. In light of the above, however, these statements seem a trifle disingenuous. The court concludes that there is sufficient evidence in public documents concerning the Project to show that the government defendants have an official policy of hostility towards adult uses. This conclusion is bolstered by an examination of prior cases in which the city's selective enforcement of valid building code provisions in order to shut down sex-related establishments was enjoined as unconstitutional. *See, e.g., Show-World Center, Inc. v. Walsh,* 438 F.Supp. 642 (S.D.N.Y.1977); *Black Jack Distributors, Inc. v. Beame,* 433 F.Supp. 1297 (S.D.N.Y.1977). In light of sworn statements by the responsible officials, however, the court is unable to conclude as a matter of fact that adult uses will be banned from the completed Project.

Moreover, the court is unable to accept plaintiffs' assertion that eradicating adult uses is the *primary motivation* of the Project—either as an end in itself or as the key to solving the social problems of Times Square. As defendants have argued, transcript at 30, it strains credibility to assert that the City and State would undertake such a massive project, involving investment of more than $1.6 billion, and displacing more than 400 businesses, in order to rid Times Square of a handful of pornographic book stores and a few adult theaters.

Plaintiffs insist that the Project's main stated purpose is to wipe out social blight by displacing special uses, including adult bookstores and theaters, and that the FEIS rests primarily on the connection between plaintiffs' uses and this social blight. In fact, as the cursory review of the facts above demonstrates, the Forty-Second Street Project has been designed to address equally intractable problems of social *and* physical blight, ranging from crime and drug use to diversity of land ownership and obsolete buildings. The Project's justification does not rest on the rather limited demonstrated connection between plaintiffs' adult uses and the social blight of Times Square. The court finds that there exists a substantial independent basis for the project that has nothing to do with the City's undeniable hostility towards purveyers of sexually explicit material.

Notwithstanding these significant, independent state interests in the Project, the court does find that the Project will have some impact on the dissemination of sexually explicit materials, since many businesses purveying such matter will at least temporarily be displaced. The court further finds, however, that since at least three dozen other adult uses will remain within a few blocks of the Project, the overall availability of sexually oriented material will not be severely curtailed in midtown Manhattan.

CONCLUSIONS OF LAW:

Defendants offer several grounds on which the court should avoid the merits of

this controversy. Defendants urge the court to exercise its discretion to abstain from deciding the case under the principles of *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) and *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). In arguing for *Pullman* abstention, defendants seek to characterize this action essentially as one challenging the legitimacy of a blight finding promulgated under an elaborate statutory scheme, challenges to which should be worked out under state law in state court. *Burford* abstention is also said to be warranted because the elaborate state regulatory scheme here implicates important state policies that should be addressed first by the state court. In a related argument, defendants argue that there is no ripe claim because plaintiffs' fear of exclusion from the new Project area is distant, speculative, and not grounded in fact. In addition, as they did in *Rosenthal & Rosenthal v. New York State Urban Development Corporation, et al.*, 605 F.Supp. 612 (S.D.N.Y. 1985), another case regarding the Project decided by this court, the private developers argue that they should be dropped as defendants because they do not exercise governmental authority and therefore cannot suppress speech unconstitutionally nor condemn land.

■ Plaintiffs reply that *Pullman* abstention is not called for because the state law involved is not unclear, and the state proceeding provided under section 207 of the New York Eminent Domain Procedure Law is limited to the record of the state administrative proceeding and therefore does not provide an adequate forum for constitutional claims. Similarly, plaintiffs argue that *Burford* abstention is inapposite because rather than seeking to interfere with a comprehensive state regulatory scheme and embroil the federal court in local matters by substituting federal judgment for local processes, here the federal court is being asked to intervene on behalf of an overarching constitutional right. The case is argued by plaintiffs to be ripe because the deprivation they protest is not merely their eventual exclusion from the Project area, but the imminent destruction of their businesses through the condemnation process now poised to begin. The private developers are argued to be proper parties, as in *Rosenthal*, because their actions are so intertwined with those of the involved governmental parties.

■ None of defendants' arguments present a bar to the court's reaching the merits of this case. For the reasons advanced by the plaintiffs, the court declines to exercise its discretion to abstain. Moreover, the imminent destruction of plaintiffs' businesses makes this an undeniably ripe controversy, notwithstanding any factual question about the City's policy on allowing plaintiffs back into the Project area. Finally, the court denies the motion of the private defendants to dismiss them as improperly joined parties. If plaintiffs state a cause of action under the first amendment and 42 U.S.C. Section 1983, it may be possible for them to demonstrate that all defendants acted in concert under color of state law to deny plaintiffs their constitutional rights. See *Rosenthal*, 605 F.Supp. at 615; *Archer Gardens, Ltd. v. Brooklyn Center Dev. Corp.*, 468 F.Supp. 609, 613 (S.D.N.Y.1979). The court proceeds, then, to consider the merits of the case, and the related questions of whether plaintiffs state a valid cause of action and whether a preliminary injunction ought to be granted against the condemnation of plaintiffs' buildings.

Plaintiffs' legal arguments proceed along two basic paths. First of all, they argue that the condemnation of their buildings for the Project constitutes a prior restraint on speech in violation of *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). They argue that the evidence connecting plaintiffs to blight in Times Square in the Final Environmental Impact Statement and other documentation does not meet the traditional heavy burden in justifying a prior restraint.

Plaintiffs insist that relocation within midtown Manhattan will be next to impossible because of restrictive zoning now in effect and the chilling effect on landlords of City efforts to discourage adult uses. Plaintiffs argue, however, that such ability to relocate is legally irrelevant because "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. State*, 308 U.S. 147, 163, 60 S.Ct. 146, 151–52, 84 L.Ed. 155 (1939). *Accord Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975). Plaintiffs suggest that just as many municipalities have turned in recent years to nuisance abatement laws, zoning, and building code enforcement to combat pornography, *see generally* Fahringer & Cambria, The New Weapons Being Used in Waging War on Pornography, 7 Cap.U.L. Rev. 553 (1978), this Project is merely another example of the government's use of allegedly "neutral" land use regulation methods to restrict speech on the basis of content.

Plaintiffs next argue that the Project violates the First Amendment and the Equal Protection Clause by classifying speech on the basis of content and burdening it with overly restrictive regulation. Plaintiffs cite to a long line of cases which hold that time, place, and manner restrictions on speech must be content-neutral. *See, e.g., Consolidated Edison Co. of New York v. Public Service Commission of New York*, 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *Police Department of the City of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). The net effect of the Project, plaintiffs argue, is "content control"; City policy statements show that rather than zoning neutrally, the city is punishing plaintiffs for their undesirable speech by putting them out of business.

Since the Project impacts upon speech, plaintiffs continue, the City must use the least restrictive means available to achieve its legitimate goals. Since police "sweep" operations and restrictions on windows and signage could fight much of the social blight of Times Square, as described in the FEIS, plaintiffs argue that the more restrictive alternative of putting them out of business is unconstitutional. Plaintiffs insist that the Project is per se unconstitutional because it amounts to retroactive zoning, and *Young v. American Mini Theatres*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) only approved prospective zoning of adult uses that did not close any existing theaters. However, even if seen as merely prospective, the plaintiffs argue that the plan is too restrictive.

Defendants argue that the FEIS's blight findings are fully adequate and that therefore the court must apply, as it did in *Rosenthal*, 605 F.Supp. at 617, only the rational-relationship scrutiny of *Berman v. Parker*, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954). Although defendants insist that no discriminatory restrictions will be placed on plaintiffs' ability to relocate within the completed project, and in fact insist that getting rid of pornography is not a major goal of the Project, they also maintain that such a restriction would be justified by the FEIS blight findings under the holding of *Young*.

The standard for granting a preliminary injunction is rigorous and well-settled: plaintiffs must demonstrate irreparable harm, and either a likelihood of success on the merits or substantial questions going to the merits and a balance of hardships tilting in their favor. *Sierra Club v. Hennessy*, 695 F.2d 643, 647 (2d Cir.1982). Defendants try to limit the case to the speculative, distant, and, they argue, false proposition that plaintiffs will be excluded from the completed Project sometime in the future. On that basis, they argue that no irreparable harm is imminent that would justify an injunction. Moreover, they suggest that no claim exists on which there is any substantial question, much less probability of success on the merits. Because an injunction now could kill the plan, defend-

ants argue that the balance of hardships is in favor of the city.

■ Despite defendants' attempt to focus the court's attention exclusively on the question of whether plaintiffs will be banned from the Project area, the imminent destruction of plaintiffs' book stores to make way for the Project clearly suffices to show irreparable harm. Nevertheless, in applying the rest of the standard, and in ruling on defendants' motion to dismiss, the court must examine the merits of plaintiffs' underlying claim.

■ The traditional deference which federal courts must accord to legislative and executive judgments regarding land use, *Berman v. Parker*, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), is inappropriate when First Amendment values are implicated. *Schad v. Borough of Mount Emphraim*, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981). Regardless of the form of the government regulation, courts will examine its operation and effect on First Amendment rights to determine its constitutionality. *Near*, 283 U.S. at 708, 51 S.Ct. at 628. Therefore, unconstitutional suppression of speech has been found not only when government overtly enjoins speech, *id.* at 722–23, 51 S.Ct. at 633; *New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971), but also where ostensibly neutral regulatory means are used, such as zoning, *Schad*, and taxation. *Speiser v. Randall*, 357 U.S. 513, 528–29, 78 S.Ct. 1332, 1343, 2 L.Ed.2d 1460 (1958). Moreover, when government seeks to discourage speech, even sanctions short of actual suppression may constitute a prior restraint if they exercise a sufficient chilling effect on protected speech. *Bantam Books v. Sullivan*, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).

That government here uses land use regulation does not then automatically immunize its actions from constitutional scrutiny. We still must examine this Project to see if it constitutes a prior restraint on protected speech, and if it does we must enjoin it unless the government carries the almost insurmountable burden of justifying such a restraint. *See New York Times*, 403 U.S. at 714, 91 S.Ct. at 2141.

■ Even if the Project does not act as a prior restraint on protected speech, it must still pass the somewhat less rigorous scrutiny mandated by *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), which provides a four-part test for measuring the impact on protected speech of government regulation aimed at non-speech goals. Regulation that has a marginal impact on protected speech is constitutionally acceptable if it is "within the constitutional power of the Government," if it serves "an important or substantial governmental interest," if that interest is "unrelated to the suppression of free expression," and if the resulting curtailment of protected speech is "no greater than is essential to the furtherance of that interest." *O'Brien*, 391 U.S. at 377, 88 S.Ct. at 1679.

Variations on the four-part *O'Brien* test have proved helpful in measuring the impact of land use regulations and similar traditionally neutral police powers on protected speech. In upholding a Detroit zoning ordinance which restricted the locations of adult theaters, the Supreme Court in *Young* used a similar analysis. Writing for the plurality, Justice Stevens noted that the ordinance did not close any existing theaters, did not restrict the overall market for protected, sexually explicit speech, and served important government interests in reducing blight. 427 U.S. at 71–72, 96 S.Ct. at 2452–2453. In his decisive and influential concurrence, Justice Powell synthesized the same points into a formal application of the *O'Brien* test. 427 U.S. at 79–81, 96 S.Ct. at 2456–2457 (Powell, J., concurring). *See also Schad*, 452 U.S. at 71 n. 10, 72, 101 S.Ct. at 2184 n. 6, 2184; *Kuzinich v. County of Santa Clara*, 689 F.2d 1345, 1347–48 (9th Cir.1982); *Purple Onion, Inc. v. Jackson*, 511 F.Supp. 1207, 1226–27 (N.D.Ga.1981); *see generally* Note, Pornography, Padlocks, and Prior Restraints: The Constitutional Limits of

The Nuisance Power, 58 N.Y.U.L.Rev. 1478, 1513–18 (1983).

Upon examining the facts of this case, it becomes clear that the condemnations planned for the Forty-Second Street Development Project, viewed as a whole, pass constitutional muster under both standards. Plaintiffs have failed to demonstrate that the project will act as a prior restraint on their protected speech, or that it will be unnecessarily suppressive under the *O'Brien* standard.

 There is no doubt that plaintiffs engage in activities protected by the First Amendment. Films, *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 502, 72 S.Ct. 777, 780, 96 L.Ed. 1098 (1952), all kinds of publications, *Lovell v. Griffin,* 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938), and nude dancing, *Schad,* 452 U.S. at 75–76, 101 S.Ct. at 2186, are all protected forms of expression. A particular work or performance is presumed to be protected unless it is found to be obscene under the standard enunciated in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). There is no suggestion that plaintiffs' property is being condemned because of any alleged obscenity, so for the purposes of these motions it will be presumed that plaintiffs distribute protected materials.

 There is also no question that the Project will have some impact on the plaintiffs' exercise of their First Amendment rights. They will be forced out of the area, and if they cannot relocate, their ability to distribute sexually-explicit material will be curtailed. Nevertheless, the Project does not constitute a prior restraint for one simple reason: Whatever the varied motivations behind the Project, in actual application the plan does not single out plaintiffs' speech for special treatment.

In the cases cited by plaintiffs in which an unconstitutional prior restraint was found, official government action has in some way imposed a restriction directly upon a particular class of speech. For example, in *Near,* 283 U.S. at 702, 51 S.Ct.

at 626, a newspaper was banned for its scandalous content. In *Bantam,* 372 U.S. at 61–62, 83 S.Ct. at 634–635, certain books were blacklisted as unsuitable for youth. In *Show-World Center, Inc. v. Walsh,* 438 F.Supp. 642, 652 (S.D.N.Y.1977), a sex-oriented establishment was issued a vacate order in a discriminatory application of the building code.

By contrast, in this case, several hundred businesses in a 13-acre area will be shut down, across the board, and a few of them will be adult uses. Plaintiffs' businesses will be closed in a neutral fashion along with all the others. Plaintiffs cannot and do not argue that their buildings are being singled out for condemnation when whole blocks of commercial buildings are being demolished. The mere fact that their speech will be burdened by this overall condemnation is not enough to make out a prior restraint, because that would prove too much; it would give businesses engaging in protected speech virtual immunity from land use changes.

 There exists no such absolute right. A business does not acquire an exemption from the neutral application of land use laws just because it engages in protected speech activities. For example, if the theater in *Show-World* had been vacated as a fire hazard as part of an even-handed enforcement program under which buildings housing many different kinds of uses were neutrally inspected, its owners would not be heard to complain of a First Amendment violation. That the City had expressed hostility towards adult uses might be evidence tending to support an allegation that the theater was being singled out for enforcement, but it would not by itself be enough to transform an otherwise neutral regulatory enforcement into an unconstitutional prior restraint. The City's actions in *Show-World* were only unconstitutional because adult uses were, in fact, singled out for action that was not enforced against others similarly situated.

If, on the other hand, the government had decided to leave standing all the buildings in the Project area, and simply to

condemn plaintiffs' stores and replace them with "positive" uses, then plaintiffs might be able to show a prior restraint. If they could, this court would have to apply the strictist scrutiny to the government's blight findings to see if the connection between plaintiffs' businesses and blight was sufficiently direct—and the interest in eradicating that particular kind of blight sufficiently compelling—to justify the drastic remedy of a prior restraint. It is unlikely that the data contained in the FEIS and other documents could withstand that scrutiny, since the actual connection between adult uses and crime, decay, and drug use is demonstrated tenuously if at all.

Looking at the project as a whole, however, and in the absence of any content-based restriction, the blight findings are adequate. It is not disputed that Times Square suffers from serious physical and social blight, ranging from underutilized and decaying buildings to violent crime, drugs, and prostitution. Viewed from this perspective, it is irrelevant that plaintiffs have not been proven to cause blight. Neither have many of the restaurants, retail shops, and other businesses that will be displaced by the Project. The Project does not purport to shut down only adult uses on the basis of blight findings about such uses alone; it looks towards a wholesale clearing and renovation of entire city blocks on the basis of a well-supported overall finding of blight—blight that is caused by many things *other* than adult uses. So long as protected speech is not singled out for special treatment, this blight may be attacked through a comprehensive land use plan without it constituting a prior restraint.

Although the court finds that the Forty-Second Street Development Project will not act as a prior restraint on plaintiffs' protected speech, it is still appropriate to evaluate the Project under the standards of *O'Brien* and *Young* to gauge whether the condemnation will have an excessive impact on protected speech. The court must approve the plan if it is "within the constitutional power of the Government," if it serves "an important or substantial govern-mental interest," if that interest is "unrelated to the suppression of free expression," and if the resulting curtailment of protected speech is "no greater than is essential to the furtherance of that interest." *O'Brien*, 391 U.S. at 377, 88 S.Ct. at 1679.

■ The Project clearly satisfies the first prong of the *O'Brien* test. Condemnation for purposes of urban renewal is a long-recognized exercise of the police power within the constitutional power of local government. *Berman*, 348 U.S. at 33–34, 75 S.Ct. at 102–103.

■ The court's findings of fact further establish that the second requirement of the test is met. The Project serves substantial state interests in eliminating physical and social blight in the form of underutilized and decaying buildings, violent crime, prostitution, and drug dealing. It seeks to preserve the area's historic theaters, overhaul the subway stations, provide a wholesale merchandise mart for local industry, and build four major office towers which will bring thousands of new people into the neighborhood while significantly increasing the area's tax base.

These goals, in and of themselves, are substantial, important, and unrelated to the suppression of free speech, thus satisfying the third strand of the *O'Brien* analysis. They are not made any less important by the possible existence of any illegitimate state motivation to put adult uses out of business because of the content of the material they purvey.

In evaluating, under the final prong of the *O'Brien* test, whether the Project is unnecessarily suppressive of speech, the court must apply a balancing test which weighs the state's goals against the impact on protected speech. In applying this test, only the legitimate, non-speech goals of fighting blight and crime will be factored into the balance. To the extent that distaste towards sexually explicit material may cause the Project planners to exaggerate the importance of eliminating adult

uses, such justifications for the Project must be discounted under the *O'Brien* test.

█ The court hesitates in concluding that the fourth requirement of the *O'Brien* test is met because of its finding that the Project will have some impact on the distribution of sexually-explicit, presumptively protected materials. Nevertheless, for several reasons explained below, the court concludes that the Project plan is no more suppressive of protected speech than necessary to further its substantial, legitimate, and lawful goals. The condemnation is therefore constitutional as applied to plaintiffs' buildings.

The court finds two facts especially important in reaching this conclusion. First, upon examining the record of failed attempts to revive Times Square and the paucity of less restrictive alternatives, the court is convinced that a substantially less restrictive plan could not be expected to fulfill the goals of the Project. Plaintiffs insist that large scale police sweeps have been successful in curtailing street crime in the Project area. However, while these sweeps may have displaced crime from one area to another, or temporarily mitigated the overall climate of criminal activity on Forty-Second Street in such a way as to actually decrease total crime, they have not had the permanent effect of really "cleaning up" the street. Crime returns when the sweeps stop, and even with these sweeps, the area still has ranked among the most crime-ridden in the city. Moreover, increased police activity does nothing to address the permanent physical problems of decaying buildings and underutilized property which, despite plaintiffs' characterizations, constitute important targets of the Project.

Second, the court has found that the general availability of sexually explicit material in the midtown area will not be severely curtailed by the closing of plaintiffs' businesses, because several dozen adult uses will remain within a few blocks of the Project area. It is this question of overall public access to protected material, rather than the economic impact on individual

commercial distributors, which Justice Powell found decisive in the application of the *O'Brien* test in his *Young* concurrance. 427 U.S. at 78 n. 2, 96 S.Ct. at 2456 n. 2. (Powell, J., concurring). Justice Powell asked two key questions: "(i) Does the ordinance impose any content limitations on the creators of adult movies or their ability to make them available to whom they desire, and (ii) does it restrict in any significant way the viewing of these movies by those who desire to see them?" *Id.* at 78, 96 S.Ct. at 2456. As Justice Powell did in *Young*, this court here answers those questions in the negative.

Plaintiffs point out, however, that the zoning plan approved in *Young* did not shut down any existing adult theaters, but only restricted locations for new ones, and that this distinction was important to the court's holding. *See* 427 U.S. at 62, 71 n. 35, 96 S.Ct. at 2448, 2453 n. 35; *id.* at 81 n. 4, 96 S.Ct. at 2457 n. 4 (Powell, J., concurring). Here, by contrast, plaintiffs' stores will be closed. Plaintiffs argue that this amounts to retroactive restrictive zoning in violation of *Young*.

This argument misconstrues the thrust of the *Young* opinion, which was not that adult uses could never be shut down, but that a zoning plan restricting the location of new adult theaters was acceptable, in part, because the overall availability of sexually explicit movies would not be significantly curtailed. "There is no claim that distributors or exhibitors of adult films are denied access to the market or, conversely, that the viewing public is unable to satisfy its appetite for sexually explicit fare. Viewed as an entity, the market for this commodity is essentially unrestrained." 427 U.S. at 62, 96 S.Ct. at 2448.

Here, too, the court has found that access to adult films and books will not be materially curtailed by the condemnation of plaintiffs' buildings. Therefore, so long as that condemnation is undertaken in pursuit of content-neutral goals, the incidental economic impact on plaintiffs does not make the Project unnecessarily suppressive of speech under *O'Brien* and *Young*.

The parties in this case have expended a great deal of energy debating the factual questions of whether plaintiffs would be able to relocate in the midtown area and what effects the City's zoning ordinance interpretation limiting multi-machine establishments would have on plaintiffs' economic viability. The court has not found it necessary to reach these questions in order to resolve this case. As plaintiffs correctly point out, if the Project condemnations amounted to a prior restraint, the ability of plaintiffs to relocate and continue their speech elsewhere would be legally irrelevant. *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 556, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975); *Schneider v. State,* 308 U.S. 147, 163, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939). The absence of a prior restraint does not make the question any more relevant. Since the court has found that no prior restraint is being imposed in this case, and that plaintiffs are being displaced neutrally along with hundreds of other businesses, plaintiffs have no legal right to relocation.

As the court has noted above, the question of economic impact on individual purveyors is not central to the *O'Brien* inquiry either. So long as the four prongs of the O'Brien test are satisfied—as they are here since no less restrictive alternatives are available to serve the important governmental objectives, and dozens of outlets for sexually explicit speech will remain in the area—the possibility that some condemned businesses will not be able to relocate does not undermine the constitutionality of the plan.

It is important to stress that the constitutionality of the City's zoning restricting establishments with four or more machines to Coney Island and other distant locales is not before the court. Moreover, the court does not here consider the constitutionality of the City's program of encouraging landlords to rent to other than adult uses. Defendants insist that the days of selective enforcement against adult uses are over, and that the City's code enforcement efforts now focus on prostitution, drug distribution, and other illegal uses. Neverthe-less, the court shares plaintiffs' skepticism, given the City's long history of hostility towards adult uses which is reflected even in the Project's own documents. It may very well be that in seeking to "mitigate" the impact of relocation by plaintiffs and other adult uses into adjoining neighborhoods, the City will engage in a campaign of official pressure and harassment that would constitute a prior restraint under *Bantam Books v. Sullivan,* 372 U.S. 58, 66–70, 83 S.Ct. 631, 637–639, 9 L.Ed.2d 584 (1963) (despite absence of actual injunction, officially sanctioned threats exerted chilling effect on protected speech that amounted to prior restraint).

Although the City's actions might give rise to a cause of action by plaintiffs some time in the future, the court does not now have before it a justiciable controversy raising either the legitimacy of the City's zoning interpretation or the effects of more informal attempts to limit relocation by adult uses. If plaintiffs attempt to relocate in Midtown and are unable to do so for these reasons, these questions may become ripe. For now, however, the court is faced only with the question of the constitutionality of the Project's condemnation plan.

Similarly, the question of whether plaintiffs will be permitted to rent space in the completed Project does not present a ripe controversy. Despite the repeated statements in the Project's documents that no adult uses will remain in the Project area, defendants now swear that no discriminatory standards will be established for renting the new stores. The anti-pornography statements are characterized as mere predictions that adult uses either will relocate somewhere else or will go out of business but, in any event, will not be able to afford to rent the desirable new space. The court has noted that it finds this line of reasoning somewhat disingenuous. However, the combination of the newly sworn and unequivocal statements of City and State officials and the fact that any controversy over access to the new Project is years away make premature any injunctive relief over this issue.

The court hopes that defendants honor their statements of neutrality, because such even-handedness towards the content of speech is constitutionally required. Although counsel for the private developer defendants have argued that a general ban on adult uses within the entire Project area would be constitutional under *Young*, the court is inclined to disagree. A blanket ban on sexually-explicit speech in stores the rental of which is controlled by the state would likely amount to an unconstitutional prior restraint.

The court does not suggest that plaintiffs have a vested right to relocate within the Project area, only that the same market forces that will determine the character of the area should be permitted to decide whether an adult bookstore is economically viable. Presumably, many modest retail operations, including coffee shops and candy stores as well as lower-volume adult uses, will be unable to pay higher rents. That is not content control. However, if plaintiffs seek to relocate in the Project area and are able to pay the going rate, they must be treated in the same manner as any other applicant. The Project's studies do not establish a direct enough connection between plaintiffs' businesses and serious conditions of blight to justify content-based discrimination in renting new space.

Just as interference with plaintiffs attempts to relocate outside the Project area might constitute a prior restraint under *Bantam Books*, refusal to rent space in the completed City-controlled Project on a content-neutral basis, or inclusion of restrictive clauses in City leases, might give rise to a cause of action under *Southeastern Promotions*, in which a non-obscene but sexually explicit theatrical production was denied equal access to a public auditorium. 420 U.S. at 556, 95 S.Ct. at 1245. Neither of these questions, however, is presented in a justiciable form by this case.

Plaintiffs further argue that if defendants really intend to permit plaintiffs to return to the Project area, then the Final Environmental Impact Statement is a meaningless document. In support of this view, plaintiffs seek to reduce the FEIS to essentially one statement: adult uses must be eliminated because they cause social blight. The court, however, has already rejected this distorted view of the Project's factual justifications. Although there are many negative statements about sex-related businesses in the FEIS, and an attempt is made to link adult uses to loitering, nowhere is it suggested that adult uses are the primary, much less the sole, cause of blight on Forty-Second Street. Rather, the FEIS found that blight is caused by the totality of physical and social conditions in Times Square.

The Project will eliminate the decaying buildings, diversity of ownership, underutilization, and other aspects of physical blight which the FEIS found in Times Square. It will thereby also remove much of the physical setting for prostitution, drug pushing, and other social blight which has plagued the area. In that context, it would not be unreasonable for defendants to conclude that adult bookstores could be permitted back into the Project area without a reoccurrance of blight—especially since these businesses would have to survive in a significantly upscaled market.

The question of whether the City's zoning will keep plaintiffs out of the new Project area also need not be addressed here. As the court has noted, plaintiffs do not yet have a claim that the zoning has prevented them from relocating. In connection with relocation within the Project some five years down the road, there is even less reason for the court to reach out to evaluate the constitutionality of the zoning. In the intervening years, the zoning ordinance may be amended or reinterpreted, or another court, facing a ripe controversy, may have cause to strike it down.

The case before the court involves only the condemnation of plaintiffs' buildings at the very outset of the Forty-Second Street Development Project. The court has found that the condemnation does not act as a prior restraint on protected speech and that it is not unnecessarily suppressive of speech under the Supreme Court's *O'Brien*

standard. Plaintiffs have thus failed to demonstrate a likelihood of success on the merits or even substantial questions going to the merits of this case. Their motion for a preliminary injunction must therefore be denied.

The court has examined matters beyond the pleadings in making its findings of facts, and all parties have had ample opportunity to present all relevant material to the court. Defendants' motion to dismiss will therefore be treated as a motion for summary judgment pursuant to Fed.R. Civ.P. 12(b)(6) and 56. The court finds that no material questions of fact remain to be determined at trial, and that defendants are entitled to judgment as a matter of law. Defendants' motion for summary judgment therefore is granted.