The FORTY–SECOND STREET COMPANY and World's Busiest Corner Corp., Plaintiffs,

v.

Edward I. KOCH, individually and as Mayor of the City of New York; Board of Estimate of the City of New York; Department of City Planning of the City of New York; Herbert Sturz, individually and as Director of the Department of City Planning; Public Development Corporation of the City of New York; City of New York; New York State Urban Development Corporation; Times Square Redevelopment Corporation; William J. Stern, individually and as Chairman, President, and Chief Executive Officer of the New York State Urban Development Corporation and as Chairman of Times Square Redevelopment Corporation; Cambridge Investment Group, Ltd.; Michael J. Lazar; Jujamcyn Company, Inc.; Park Tower Realty Corp.; New York Trade Mart; and Tishman Speyer Properties, individually and as General Partner of New York Trade Mart, Defendants.

No. 84 Civ. 8780 (CBM).

United States District Court, S.D. New York.

July 18, 1985.

Rubin Baum Levin Constant & Friedman by Martin J. Schwartz, Gerald Harris, New York City, Alan H. Levine, New York City, for plaintiffs.

Frederick A.O. Schwarz, Jr., Corp. Counsel by Carolyn Herman, Gary Schuller, New York City, for defendants Koch, Bd. of Estimate, Dept. of City Planning, Sturz, Public Development Corp.

Leahey & Johnson, by Peter James Johnson, New York City, for defendants New York State Urban Development Corp., Times Square Redevelopment Corp., and Stern.

Paul Weiss Rifkind Wharton & Garrison, by Martin Flumenbaum, New York City, for defendants Tishman Speyer Properties and New York Trade Mart.

Kaye Scholer Fierman Hays & Handler, by Gerald Sobel, New York City, for defendants Park Tower Realty Corp.

Breed Abbott & Morgan, by Robert Bicks, New York City, for defendants Cambridge Investment Group, Ltd., Michael J. Lazar, and the Jujamcyn Co.

## OPINION

MOTLEY, Chief Judge.

Plaintiffs, two companies affiliated with the Brandt Organization, hold long-term leases on eight motion picture theaters on Forty-Second Street which are slated to be condemned and converted to retail and live theater use as part of the Forty-Second Street Development Project. The theaters exhibit primarily low-budget martial arts and horror films and some sexually explicit films to a largely low-income and minority audience. Plaintiffs seek to enjoin the Project, which will also bring office towers, a hotel, and a merchandise mart to the Times Square area, only insofar as it calls for the condemnation and changed use of these theaters. Plaintiffs allege that defendants, including various state officials and agencies and several private developers involved in the Project, are motivated by hostility towards the content of plaintiffs' movies and the racial composition of plaintiffs' audience, and that the plan to condemn the theaters therefore violates the First Amendment and Equal Protection rights of both plaintiff theater operators and their minority customers.

This court has already confronted, in two previous cases, many of the issues implicated by the City's ambitious plans for Times Square. In *Rosenthal & Rosenthal v. New York State Urban Dev. Corp.*, 605 F.Supp. 612 (S.D.N.Y.1985), the court rejected a claim that the proposed condemnation of a viable office building on Forty-First Street

as part of the Project was not rationally related to a legitimate government purpose. In *G. & A. Books, Inc. v. Stern*, 604 F.Supp. 898 (S.D.N.Y.1985), the court held that the condemnation of several adult bookstores along with hundreds of other businesses to make way for the four large office towers planned for the Project did not violate the First Amendment.

Arguing that the court's disposition of *G. & A. Books* controls the present case, defendants seek summary judgment on plaintiffs' First Amendment claim, and argue as well for dismissal of plaintiffs' claim of racial discrimination.[1] Defendants also urge, as they did in the earlier dismissed cases, that this court should exercise its discretion to abstain from deciding the present matter. After careful consideration of the voluminous submissions in this case, the court declines to abstain, but concludes that there exist no disputed issues of material fact with respect to plaintiffs' race and speech claims. Therefore, for the reasons set forth below, defendants' motion for summary judgment is granted.

FACTS:

At the outset, the court wishes to make clear what is not in dispute in this case. The court has already made substantial and detailed findings with respect to the plan to redevelop Times Square.

The Forty-Second Street Development Project is a large-scale redevelopment scheme jointly undertaken by the City and the State which would dramatically alter the physical, social, and cultural environment of the Times Square area. The Project emerged after years of false starts and failed initiatives by public officials seeking to bring renewal to Forty-Second Street. The present plan is the product of a lengthy, statutorily mandated land use review procedure which included extensive public hearings and resulted in hundreds of pages of detailed findings on the Project's impact. Even a brief, partial summary of these proceedings and findings is sufficient for this court to conclude that substantial and important public purposes underlie the Project.

*G. & A. Books*, 604 F.Supp. at 902.

Although the court's findings of fact in *G. & A. Books* cannot have collateral estoppel effect on the different plaintiffs in this case, these plaintiffs do not dispute the essential legitimacy of the Project or its goals. Therefore, to the extent that the findings in *G. & A. Books* reflect undisputed matters of public record and are not challenged in factual disputes addressed herein, they are adopted here by reference in the interests of brevity.

In short, the Project seeks to eradicate what is characterized without dispute as blight in the Times Square area including violent crime, drug dealing, prostitution, decaying and underutilized buildings, and depressed property values. The Project takes a drastic approach which calls for the wholesale clearing of several hundred businesses to make way for four large office towers and other development. The goal is to transform the area by radically altering its physical and social makeup with upscale offices, retail businesses, and cultural enterprises. *See G. & A. Books*, 604 F.Supp. at 902–05.

The *wisdom* of this plan is not, all parties agree, a matter for this court to evaluate. Moreover, the plan's overall *legitimacy* and the legitimacy of its underlying *goals* are not challenged by any party. Plaintiffs do not allege that the entire Project is motivated either by racist or anti-free speech goals. Therefore, the only area of potential dispute in this case is the

1. Defendants' motion originally was briefed and argued as one to dismiss for failure to state a claim upon which relief can be granted. Following oral argument on February 1, 1985, the court concluded that the motion was best considered as one for summary judgment. In orders dated February 5 and February 13, 1985, the court set a schedule for submission of supplemental briefs addressing the legitimacy of the Project's purposes and whether the condemnation amounted to a prior restraint. Both sides have taken advantage of the opportunity to present substantial new factual material, which the court has thoroughly reviewed. In addition, a second oral argument was heard on June 28, 1985.

constitutionality of one part of the Project: the plan to condemn plaintiffs' theaters and convert them to live theater and other non-movie uses.

Under the Project plan, plaintiffs' theaters on Forty-Second Street are the only buildings to be condemned but not destroyed. Instead, they will be renovated, altered, and turned over to other operators for uses consistent with the Project. The Lyric, Apollo, and Selwyn theaters will be converted to live theater use with defendant Jujamcyn Company as operator. The Times Square and Empire theaters will be converted to retail and restaurant use. The Liberty and Victory theaters will be used for non-profit or "institutional" theater. The Rialto theater and the attached office building will be demolished. *See* Final Environmental Impact Statement (FEIS) at S–12, 1–12 and Table 1–1.

Several purposes are stated to underlie this aspect of the Project: To preserve the historically and architecturally significant theaters, to restore the theaters to their historic use as live theaters, to encourage live theater in the Broadway area, and to provide new retail and institutional facilities to support the area's other new developments such as the office towers and Trade Mart. *See* FEIS at S–3, S–12–13; Affidavit of Defendant William J. Stern at 2–4.

Plaintiffs maintain that their theaters in fact are being singled out for condemnation because defendants object to the content of the movies they exhibit, which include low-budget martial arts and horror movies along with some mainstream Hollywood fare and sexually explicit films. In addition, plaintiffs allege that the condemnation is motivated in part by racial bias in that the Project planners seek to remove from the area the thousands of blacks and Hispanics who comprise three-quarters of plaintiffs' daily audience. Plaintiffs allege that it will be impossible for the theaters to relocate and that the Project therefore will cut off access to their type of low-cost entertainment, which is offered in few other locations in New York.

In support of these First Amendment and Equal Protection claims and in an attempt to defeat the instant motion for summary judgment, plaintiffs have submitted substantial material which challenges many of the factual assumptions alleged to underlie the policy decisions that produced the present Project plan. This material includes affidavits from prominent individuals in the fields of social psychology, sociology, architecture, and entertainment. While the court might be inclined to agree with much of what plaintiffs assert as a matter of social policy, most of plaintiffs' allegations go to the wisdom rather than the legitimacy of those aspects of the Project affecting plaintiffs' theaters. Therefore, although plaintiffs raise many factual questions which may be in dispute, the court concludes that, by and large, these questions of fact are not material to the motion for summary judgment. Plaintiffs' allegations will for this reason be summarized very briefly herein.

Plaintiffs, through the affidavit of architect Michael William Toto, allege that their theaters are not blighted, are well-maintained, and are suitable for continued use as movie theaters, that the theaters are either not architecturally significant or are not capable of having their significant features restored, and that the Project plan will not "restore" the theaters architecturally but will simply alter them to allow new uses. The willingness of Project planners to gut some of the theaters for retail use is argued to belie their intention to preserve outstanding architecture. *See generally* Affidavit of Michael William Toto. To the extent that defendants do seek to maintain significant architectural features, such as the noteworthy facades of many of the theaters, plaintiffs insist that they will cooperate with the City and that condemning the theaters is therefore unnecessary. In any event, urge plaintiffs, landmarking or condemning just the facades of certain theaters would adequately serve the state interest in historic preservation.

Plaintiffs further allege that their theaters historically were not devoted primari-

ly to "legitimate" theater but rather have a varied history of use for burlesque, vaudeville, and movies, and a half-century commitment to low-cost movie entertainment. *See* Affidavit of Carl M. Levine at 7–9. If the condemnation is allowed, plaintiffs allege that low-income New Yorkers will be deprived of a significant entertainment center. *See id.* at 11–17. City hostility towards new movie theaters and prohibitive economics will prevent plaintiffs' relocation. *Id.* at 20–23. Moreover, plaintiffs allege that there exists a surfeit of legitimate Broadway theaters, that the Broadway economy has been depressed for several years, and that most of the converted theaters are likely to remain unrented, rendering the proposed conversion economic folly. *See generally* Affidavit of Arthur Cantor.

Plaintiffs urge the foregoing in support of their allegation that the plan to condemn their theaters is not supported by significant historical, cultural, or architectural goals, but rather is motivated by hostility toward their films and their audience. Plaintiffs cite myriad negative comments by government officials about their theaters as further support for this conclusion. Plaintiffs allege that their theaters are linked in Project studies, without support, to blight in the Times Square area in that the theaters are falsely assumed to be deteriorating or to be the site of rampant crime. *See, e.g.,* FEIS at S–7, 1–4, 1–6, 1–23, 2–99. Moreover, plaintiffs allege that the very stated goals of the Project reflect the planners' open hostility toward the content of plaintiffs' exhibited films: "... to preserve and restore the area's extraordinary older theaters for theatrical and *upgraded* movie use...." FEIS at S–3 (emphasis added).

This hostility, argue plaintiffs, is closely linked to defendants' distaste for the largely low-income and minority audience attracted to plaintiffs' theaters. Plaintiffs have submitted the affidavits of psychologist Kenneth B. Clark and sociologist Herbert J. Gans to support their allegation that the Project plan is infected with class and race bias. Dr. Clark conducted a survey which allegedly demonstrates that plaintiffs' minority-based audience is stable and law-abiding and depends on plaintiffs' theaters for low-cost entertainment. He concludes that statements in the FEIS and other documents seeking to link the theaters to crime and blight are based on racial stereotypes and lack any supporting data. *See generally* Affidavit of Kenneth B. Clark.

Dr. Gans makes similar observations. He suggests that the Project planners fail to distinguish between the small number of people who actually engage in illegal activities on Forty-Second Street and the larger number of law-abiding black and Hispanic citizens who simply patronize plaintiffs' theaters but are nonetheless "ominous" to white, middle-class observers. Instead, Dr. Gans concludes, the FEIS falls back on racial stereotyping to justify removing them from the Project area. *See generally* Affidavit of Herbert J. Gans.

In sum, plaintiffs argue that the condemnation of their theaters does not serve the public purposes that are assigned for it, but rather reflects a governmental attempt to displace a brand of speech and a kind of audience deemed distasteful. The condemnation is therefore argued to violate both the First Amendment and the Equal Protection Clause.

Defendants do not attempt to refute plaintiffs' factual allegations point by point. Defendants deny that race or content bias motivates the Project or any of its parts. Beyond that, defendants simply argue that the balance of plaintiffs' allegations are immaterial in that they go to matters within the discretion of defendants. Defendants argue that other theaters in New York exhibit action and martial arts films and that plaintiffs would only be prevented from relocating by the requirements of the free market. *See generally* Affidavit of Jay Cohen. Defendants maintain that a link in fact has been demonstrated in the Project's planning documents between the high-volume business of plaintiffs' theaters and the heightened

crime and loitering of Forty-Second Street. Nevertheless, defendants maintain that the legitimacy of the Project's goals and methods viewed as a whole should, as it did in *G. & A. Books*, control the outcome of this case.

DISCUSSION:

### Abstention

■ Defendants urge this court to abstain from deciding the present case on grounds of efficiency, comity, and judicial restraint. This question has been briefed and argued along substantially the same lines as was done in the previously decided cases regarding this project. For the same reasons relied upon by the court before— the importance of the federal rights implicated in the present case and the absence of an adequate, centralized state forum for these claims—the court declines to abstain. *See Rosenthal,* 605 F.Supp. at 615; *G. & A. Books,* 604 F.Supp. at 905–06.

### Race Discrimination

Defendants seek summary judgment on plaintiffs' Equal Protection claim [2] on three different grounds: 1) that only rational relationship scrutiny should be applied in any eminent domain case; 2) that plaintiffs lack standing to assert the rights of their minority customers because companies related to plaintiffs sought the contract to operate the theaters under the Project plan; and 3) that plaintiffs have failed to demonstrate that a discriminatory *purpose* and not just a disproportionate racial *impact* is reflected in the Project plan. Defendants concede that the FEIS shows an awareness that the Project will result in the displacement of a large number of minority moviegoers by a mostly white, upscale Broadway audience. This awareness amounts to "intent" in the sense that one "intends" the natural consequences of one's actions. However, defendants maintain that plaintiffs have failed to allege facts tending to show that they intend to discriminate

against blacks or Hispanics *as such*. The demographic change is argued to be a side-effect and not a purpose of the Project; the goal is to upgrade the area, but everyone will be welcome in the new facilities.

■ Defendants' first two arguments fail to persuade. First, while broad deference generally is due to governmental regulation of land use, *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 2329, 2331, 81 L.Ed.2d 186, 197, 200 (1984); *Berman v. Parker,* 348 U.S. 26, 32, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954), governmental action alleged to infringe fundamental constitutional rights must be carefully examined. *Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981). *See G. & A. Books,* 604 F.Supp. at 901; *cf. Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 708, 51 S.Ct. 625, 628, 75 L.Ed. 1357 (1931). There is no reason to treat eminent domain any differently from any other basic governmental power; government may no more effect an unconstitutional purpose through eminent domain than through zoning, injunctions, criminal prosecution, or any other method.

■ Second, although plaintiffs generally lack standing to assert the rights of third parties, *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975), this case falls squarely within a firmly established exception: "[V]endors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates for the rights of third parties who seek access to their market or function." *Craig v. Boren,* 429 U.S. 190, 195, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976). Here, as in *Craig,* plaintiffs will suffer sufficient injury in fact to guarantee adverseness and to satisfy constitutionally based standing requirements. *Id.* at 194, 97 S.Ct. at 455.

Moreover, plaintiffs do not forfeit their ability to assert the rights of their patrons

---

**2.** Plaintiffs allege that the Project violates the Equal Protection Clause on both race discrimination and First Amendment grounds. The court will address the First Amendment issues

in this case in the following section; this section will focus on plaintiffs' claim of racial discrimination.

simply because another company with which they may be affiliated has sought to participate in the Forty-Second Street Project by submitting a bid to operate the converted theaters. Plaintiffs have made clear their desire to continue to operate the theaters on the present basis. Their submission of a proposal under the threat of condemnation must be characterized as prudent self-protection and not as "selling out" the interests of those they seek to represent. The court rejects defendants' standing argument.

■ Plaintiffs have a more difficult time, however, rebutting defendants' third argument. In the absence of an explicit racial classification, plaintiffs must show a discriminatory *purpose* on the part of defendants in order to prevail on their Equal Protection claim. *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979). Mere awareness of disproportionate impact or consequences, as defendants argue, does not establish discriminatory purpose. *Id.* at 279, 99 S.Ct. at 2296. However, there is no requirement that racial bias be the sole or even primary motivation, so long as it is an actual purpose of the governmental action, rather than a mere by-product. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–66, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450 (1977).

Plaintiffs arguably have pleaded sufficient discriminatory intent to survive a motion to dismiss the complaint. *See* Complaint at paragraph 49. They have failed, however, in the face of this motion for summary judgment, to allege specific facts tending to support their theory. The affidavits of Professors Clark and Gans, while presenting eloquent and perhaps persuasive arguments against the Project on the basis of social policy, do little to satisfy plaintiffs' burden. Evidence that defendants, in formulating a plan which undeniably intends to attract more affluent consumers to Times Square, may have fallen prey to stereotypical thinking in characterizing the current population of Times Square, does not prove that defendants seek to remove blacks and Hispanics *as blacks and Hispanics*. There is no denying that this is a *class-*biased plan. The City has made a policy decision to turn Times Square into an upscale business and entertainment center. Discrimination based on wealth, however, does not pose the same sort of constitutional problems as does discrimination based on suspect classifications such as race or alienage. *See San Antonio Ind. School Dist. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). In seeking to upgrade Times Square, this Project will have an undeniable incidental impact on blacks and Hispanics, who comprise a disproportionate segment of the low-income population which presumably will be unable to afford many of the facilities in the completed Project area. This result may reflect dubious social policy but it does nothing under present law to establish racist purpose and therefore is not cognizable by this court.

■ In short, there is nothing in this record to suggest that defendants seek to exclude black or Hispanic people simply because they are black or Hispanic. A bare allegation with no support is insufficient to create a triable issue of material fact. Defendants' motion for summary judgment on plaintiffs' racial discrimination claim therefore is granted.

### First Amendment

The parties agree that the court's First Amendment analysis in this case should be guided by the court's previous opinion in *G. & A. Books*. They differ, of course, on the outcome of that analysis. As in *G. & A. Books*, the court will evaluate the condemnation of plaintiffs' theaters under both the prior restraint analysis of *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), and its progeny and the four part test of *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), which examines the impact on speech of legitimate government

regulation aimed at non-speech goals. *See G. & A. Books,* 604 F.Supp. at 908–09.[3]

Plaintiffs argue vigorously that the condemnation of their theaters amounts to an unconstitutional prior restraint. Plaintiffs allege that they are being singled out because theirs are the only buildings to be condemned but not torn down. They point to the many hostile comments toward their films which are undeniably scattered throughout the Project's documentation and argue for an inference that suppressing their speech is a goal of the Project. In the alternative, plaintiffs argue that the condemnation fails the *O'Brien* test in that it is unnecessarily suppressive of speech in light of the government interests served. They maintain that the Project will cut off access for most New Yorkers to low-cost martial arts films and that the Project's legitimate goals of preserving historic buildings and supporting culture could be served without forcing out their theaters.

Defendants maintain that any remaining factual disputes over the goals or impact of the Project are immaterial. They insist that there is no evidence to show that ridding the area of plaintiffs' films is a *goal* of the project rather than merely a predicted side effect. Defendants further argue that plaintiffs' buildings are being condemned neutrally along with hundreds of others, that less restrictive alternatives would not fully serve the goals of the Project, and that, in any event, having found legitimate the overall purposes of the Project, this court must defer to the government defendants on the details thereof.

The court concludes, for reasons substantially similar to those advanced in *G. & A. Books,* that the instant condemnation passes constitutional muster under both First Amendment tests. The discussion below will focus on issues and arguments new to this case.

In *G. & A. Books,* 604 F.Supp. at 909, the court reviewed cases in which the government had singled out a particular class of speech for a special burden amounting to a prior restraint. *See, e.g., Near,* 283 U.S. at 702, 51 S.Ct. at 626; *Show-World Center, Inc. v. Walsh,* 438 F.Supp. 642, 652 (S.D.N. Y.1977).

> By contrast, in this case, several hundred businesses in a 13-acre area will be shut down, across the board, and a few of them will be adult uses. Plaintiffs' businesses will be closed in a neutral fashion along with all the others. Plaintiffs cannot and do not argue that their buildings are being singled out for condemnation when whole blocks of commercial buildings are being demolished. The mere fact that their speech will be burdened by this overall condemnation is not enough to make out a prior restraint, because that would prove too much; it would give businesses engaging in protected speech virtual immunity from land use changes.

*G. & A. Books,* 604 F.Supp. at 909.

■ The major distinction in this case is that plaintiffs' buildings, although condemned, will remain standing. That is a distinction without a difference, however, because the effect on plaintiffs will be exactly the same—they will lose their buildings—and the effect on their free speech will be identical whether the buildings are renovated or razed. Were defendants to bulldoze plaintiffs' buildings along with the commercial properties whose condemnations were upheld in *G. & A. Books* and *Rosenthal,* this would be precisely the same case. The condemnation does not become a prior restraint simply because defendants choose to re-use rather than destroy the condemned structures.

■ As in *G. & A. Books,* the court must focus here on the overall goals and meth-

---

**3.** Plaintiffs' claim that the Project violates the Equal Protection Clause by discriminating on the basis of speech content presents essentially the same issues as those addressed by the two-part analysis adopted by the court. If the Project does not constitute a prior restraint and satisfies the *O'Brien* test, then it follows that it does not violate the Equal Protection Clause since any disparate impact on plaintiffs' speech will have been justified by legitimate, non-speech state interests.

ods of the Project. The Project calls for the condemnation of hundreds of different businesses, including those of plaintiffs, in service of legitimate, lawful goals: to upgrade the Times Square area by bringing in upscale offices, businesses, and entertainment, to preserve historic theaters and to restore them to their previous use for live theater. The court need not endorse these goals in order to hold that they are legitimate and content neutral. Against this general picture, plaintiffs have failed to set forth material factual disputes which might support their claim of being singled out for content-based suppression.

Plaintiffs do make a spirited case that the Project's plan to convert their buildings for live theater use is historically, socially, and economically unwise. However, our concern is only that governmental goals are legitimate, not that they are positive, well thought out, or well served by the plan at hand. Unless plaintiffs could allege in good faith, as they cannot here, that the purposes put forth by the government are a sham, arguments directed at the wisdom of the Project are insufficient in and of themselves to create a triable issue of material fact as to whether the true goal of the condemnation is to suppress plaintiffs' speech. Moreover, mere hostility to speech which will be incidentally burdened by a Project that has other primary purposes is insufficient, and that is all plaintiffs can claim to show. There is no evidence suggesting an overall attempt to restrict public access to martial arts or action films. All that is shown is an attempt to remove an unusual concentration of high-volume, low-priced theaters from a two-block area as part of an overall reshaping of the Times Square area in a more rarefied and affluent image. The plan is unquestionably geared towards the wealthier classes, and as such is subject to criticism in the public arena. The Project may not be the best approach to the problems of Times Square, but that does not make it a prior restraint on protected speech.

There is, in short, no evidence of a desire on the part of the government defendants to silence plaintiffs because of the message of their films or even to reduce public access to these films, except as an incident of changing the overall socio-economic makeup of the immediate Times Square area. In a constitutional sense, therefore, plaintiffs' speech is not being "singled out".

Plaintiffs argue that since the Project goals speak of "upgraded" movie use which may be allowed on an interim basis in the converted theaters, see FEIS at S-3, 2-140, removal of plaintiffs constitutes content control. Defendants' decision to permit the temporary exhibition of movies in some theaters until economically feasible live uses are found does not necessarily render unconstitutional the otherwise legitimate goal of promoting live theater as part of a unified plan to redevelop the area. Constitutional problems involving future content control may be lurking in the term "upgraded", but this does not present a controversy ripe for the court's determination. *See G. & A. Books,* 604 F.Supp. at 912–13. No content controls are being placed on plaintiffs. Their buildings are simply being condemned along with hundreds of others in the Project area.

Although the court concludes that the condemnation of the theaters as part of the Forty-Second Street Development Project will not act as a prior restraint upon plaintiffs' speech, further analysis is warranted under the four-part test of *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), which has been useful to courts seeking to gauge the incidental impact on protected speech of government land use plans aimed at non-speech goals. *See G. & A. Books,* 604 F.Supp. at 908–09; *see also Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 71 n. 10, 72, 101 S.Ct. 2176, 2184 n. 10, 2185, 68 L.Ed.2d 691 (1981); *Young v. American Mini Theatres,* 427 U.S. 50, 78–81, 96 S.Ct. 2440, 2456–58, 49 L.Ed.2d 310 (1976) (Powell, J., concurring); *see generally* Note, Pornography, Padlocks, and Prior Restraints: The Constitutional Limits of the Nuisance Power, 58 N.Y.U.L.Rev. 1478, 1513–18 (1983).

 Under the *O'Brien* test, governmental regulation that has a marginal impact on protected speech is constitutional if it is "within the constitutional power of the government," if it serves "an important or substantial governmental interest," if that interest is "unrelated to the suppression of free expression," and if the resulting curtailment of speech is "no greater than is essential to the furtherance of that interest." *O'Brien*, 391 U.S. at 377, 88 S.Ct. at 1679. After examining the facts of this case, and in light of the analysis of *G. & A. Books*, the court finds that the challenged aspect of the Project is constitutional under *O'Brien*.

 The planned condemnation of plaintiffs' theaters is certainly within the constitutional power of the government, satisfying the first prong of the *O'Brien* test. Condemnation for purposes of urban renewal has long been recognized as a proper use of the state's police power. *Berman v. Parker*, 348 U.S. 26, 33–34, 75 S.Ct. 98, 102–03, 99 L.Ed. 27 (1954). The New York State Urban Development Corporation Act authorizes the state to use condemnation to further a wide variety of legitimate purposes. New York Unconsol.Laws section 6251 *et seq.* (McKinney 1979).

The second and third parts of the *O'Brien* test also are satisfied whether one examines the overall goals of the Project, as the court believes is appropriate, or only the state purposes underlying the condemnation of plaintiffs' theaters. It is beyond cavil that Times Square suffers from extraordinary blight and that this Project, whatever its merits, represents an attempt to deal with this blight in a radical and all-encompassing way. A major strategy of the Project is to promote uses within the Project area that will attract an upscale audience, including live theater and upgraded retail stores and restaurants, with the ultimate goals of reducing violent crime, drug dealing, and prostitution, strengthening property values and the tax base, and supporting the theater industry and tourism in the area. Viewed broadly, these are clearly substantial goals and they are just as clearly not related to suppressing speech.

Condemning plaintiffs' theaters and replacing their current fare with live theater, retail, and other uses serves these legitimate, non-speech goals by reducing the volume of traffic in the theaters, by preserving historic theaters and turning them into new venues for live theater, and by creating new uses which will attract more affluent consumers. The preservation of historic structures is certainly a legitimate and constitutional goal of government, *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 129, 98 S.Ct. 2646, 2661, 57 L.Ed.2d 631 (1978), as is support of cultural institutions. *Hotel Dorset Co. v. Trust For Cultural Resources*, 46 N.Y.2d 358, 372, 385 N.E.2d 1284, 413 N.Y. S.2d 357, 364 (1978). Again, the court will not consider how *well* these goals are served by the present plan, only that the plan actually does, to some significant degree, serve state purposes that are substantial and unrelated to the suppression of speech. Even accepting plaintiffs' factual allegations that their theaters are safe and viable and that the City's plan is ill-conceived, these legitimate state interests are still served by the condemnation.

 Moreover, under the second and third prongs of the *O'Brien* test, it is of no moment that defendants may not have demonstrated a strong connection between the operation of the theaters and blight in Times Square. As this court said in *G. & A. Books*,

[I]t is irrelevant that plaintiffs have not been proven to cause blight. Neither have many of the restaurants, retail shops, and other businesses that will be displaced by the Project. The Project does not purport to shut down only adult uses on the basis of blight findings about such uses alone; it looks towards a wholesale clearing and renovation of entire city blocks on the basis of a well-supported overall finding of blight—blight that is caused by many things *other* than adult uses.

*Id.* at 910 (emphasis in original). Similarly, in the present case, plaintiffs' theaters will be condemned along with hundreds of other businesses in the area. It is not necessary that the government demonstrate a nexus between the theaters themselves and blight in Times Square—only that the condemnation of the theaters serve an important state purpose unrelated to the suppression of speech. The court finds that it does, and that plaintiffs' factual allegations therefore are not material.

Contrary to plaintiffs' assertions, *Young v. American Mini Theatres*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), does not require a different result. Plaintiff notes that it was important to both the plurality in *Young*, 427 U.S. at 71 n. 34, 96 S.Ct. at 2453 n. 34, and the pivotal concurrence of Justice Powell, *id.* at 82, 96 S.Ct. at 2458, that the state had demonstrated a direct relationship between adult theaters and blight. *Young*, however, dealt with a zoning plan which distinguished between theaters on the basis of content and limited the possible locations for adult theaters. The Court upheld this facially content-based scheme because evidence linking adult theaters and blight provided a substantial governmental interest *unrelated* to content which justified classifying theaters along these lines.

It does not follow from *Young* that only theaters causing blight may be condemned. All that is necessary is that substantial reasons other than content be given for government action incidentally affecting speech. Such reasons have been provided in the case at bar, and the court therefore finds that the second and third prongs of the *O'Brien* test have been satisfied.

■ The fourth part of the test essentially requires the court to balance the state interests served against the marginal impact on speech caused by the challenged governmental action. This analysis does not require that the state have chosen the least restrictive alternative, as is required under the "strict scrutiny" test, only that substantially less restrictive alternatives to achieve the same ends were not available which would render the challenged plan unnecessarily suppressive of speech. In other words, if the legitimate state interest would be served less effectively without the proposed regulation, then the incidental impact on speech is permissible under *O'Brien*. *See United States v. Albertini*, ── U.S. ──, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985).

The court has already found that several important state interests are served by the Project and the planned condemnation of plaintiffs' theaters. It is equally clear that without the condemnation, many of these interests would be served less effectively. Although the state interests in preserving the theaters' historic facades and reducing loitering in front of the theaters perhaps could be achieved, without condemning the theaters, through the use of such methods as landmark laws and police sweeps, such methods would not fulfill the Project's broader goal of radically altering the face of Times Square by providing new uses and attracting new people to the area. Changing the use of the theaters clearly will make at least some contribution to these goals, and certainly fits in with the overall Project plan.

■ Against the substantial state interests served by the Project, the court must weigh the marginal effect on plaintiffs' speech. Relying on the undisputed facts in this record, the court finds that this impact is minimal. Plaintiffs have attempted to prove that they will be unable to relocate but have not alleged facts tending to show that this inability is the result of government suppression. Any difficulty that plaintiffs will have in relocating is the result either of content-neutral zoning which affects all theaters, or of the operation of the free market. The constitution does not require that plaintiffs be able to duplicate their present favorable economic conditions, only that government not restrict plaintiffs' ability to find new outlets. *See Young*, 427 U.S. at 77–79, 96 S.Ct. at 2455–57 (Powell, J. concurring). As in *Young*,

myriad locations exist in Manhattan and the City at large for new theaters and scores of theaters now exist which could be devoted to the kinds of films that plaintiffs exhibit. If, as plaintiffs allege, there is a significant demand for their product, the market will provide an outlet.

In any event, in the absence of severe government restrictions on plaintiffs' *right* to relocate, speculation regarding plaintiffs' economic *ability* to relocate is simply irrelevant. The only restriction placed on plaintiffs' speech is their exclusion from a small sliver of midtown Manhattan. This incidental burden is comparatively minor given the substantial state interests served by the Project. The court concludes, therefore, that the condemnation of plaintiffs' theaters is not unnecessarily suppressive of free speech and therefore satisfies the final prong of the *O'Brien* test.

Plaintiffs have failed to identify disputed questions of fact material to their claim that defendants' plan to condemn plaintiffs' theaters is a prior restraint or is unnecessarily suppressive under *O'Brien.* Defendants have demonstrated that the condemnation serves important governmental interests unrelated to the suppression of speech. Plaintiffs' alleged disputes relate mainly to questions of policy that are beyond the scope of this court's permitted review. In the absence of disputed facts of constitutional significance, the court finds that defendants are entitled to judgment as a matter of law. Defendants' motion for summary judgment therefore is granted.