542 A.2d 1317

**INSURANCE ADJUSTMENT BUREAU, Appellant,**

v.

**The INSURANCE COMMISSIONER FOR the COMMONWEALTH of PENNSYLVANIA, Appellee.**

Supreme Court of Pennsylvania.

Argued Dec. 10, 1987.

Decided May 20, 1988.

Gregory J. Boles, Alan E. Kear, Philadelphia, for appellant.

Jerome T. Foerster, Deputy Atty. Gen., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

On February 28, 1984 the Insurance Adjustment Bureau (the Bureau), a partnership engaged in the business of negotiating casualty loss claims on behalf of insured property owners, filed a complaint in equity addressed to the original jurisdiction of Commonwealth Court seeking, inter alia, a preliminary injunction enjoining the implementation of an amendment to the Public Adjuster and Public Adjuster Solicitor law, Act of December 20, 1983, P.L. 260, No. 72, 63 P.S. § 1601–1608. The amendment, in pertinent part, provides:

No public adjus⁺er or public adjuster solicitor shall solicit a client for employment within twenty-four hours of a fire or other catastrophe or other occurrence which is the basis of the solicitation. With respect to a fire, the 24–hour period shall begin at such time as the fire department in charge determines that the fire is extinguished.

63 P.S. § 1605(a). The Bureau's claim was that this portion of the amendment infringed upon its rights and its customers' rights to freedom of speech, due process, and equal protection under the Pennsylvania and the United States Constitutions.

Commonwealth Court conducted a hearing on April 26, 1984 and granted the Bureau's Motion for Preliminary Injunction. On December 20, 1984 Commonwealth Court overruled preliminary objections filed by the Commonwealth and directed the Commonwealth to answer the complaint and petition. The Bureau then filed a motion for summary judgment, and on August 13, 1987, after a hearing, a three judge panel of Commonwealth Court denied the Bureau's motion for summary judgment, dissolved the preliminary injunction, dismissed the complaint and granted summary judgment in favor of the Commonwealth, 530 A.2d 132. The Bureau's petition for reargument and appli-

cation for injunction pending appeal were denied and on September 10, 1987, the Bureau appealed to this Court from the judgment of Commonwealth Court.[1]

The Bureau now asserts that the statute's twenty-four hour ban on solicitation impermissibly restricts freedom of speech; that it violates the Bureau's right to equal protection of the law, that it is an unlawful exercise of the police power and an unlawful special law under the Pennsylvania Constitution designed to benefit a special interest; and that the statute is excessively vague in violation of the Bureau's due process right to receive notice of prohibited conduct.

## I.

The statute defines "public adjuster" as a person or entity who adjusts loss claims on behalf of an insured, and "public adjustor solicitor" as a person who solicits contracts for public adjusting services. 63 P.S. § 1601. The Bureau claims that insured property owners, following a loss, often fail to take necessary steps to protect their property and receive a prompt and fair claim settlement. An insured may be emotionally distraught, he may be too busy or otherwise committed, or he may not have the ability or understanding necessary to process his own claim. In any event, public adjusters typically arrange emergency protection of damaged property, secure temporary lodging for displaced persons, advise insureds regarding their rights and duties under their insurance contracts, consult with insurance companies, and commence inventory and appraisal of the loss.

The twenty-four hour restriction is significant to public adjusters and public adjuster solicitors because, prior to the amendment, they routinely approached property owners

1. In addition to its appeal, The Bureau has petitioned this Court to restore its injunction pending appeal. Although the briefs received in this case indicate that the parties have directed most of their attention to the question of whether the Bureau's injunction should be reinstated pending appeal, because we are now addressing the merits of the case, not the interim question of injunction, there is no need to decide whether the injunction should be reissued.

within hours of a disaster, explaining their services, and, if a contract was signed, beginning work. They assert that contacting the victims of a disaster within twenty-four hours of the disaster is often necessary in order to locate the property owner before he moves to an unlisted, temporary location because of the disaster.

The Commonwealth, on the other hand, claims that the statute prohibiting solicitation of business by public adjusters or public adjuster solicitors within twenty-four hours of a disaster or fire is permissible, in part, because it is only a time, place and manner regulation. Additionally, the Commonwealth argues that if public adjusters and public adjuster solicitors are allowed to solicit business within twenty-four hours of a disaster they may utilize fraudulent practices at a time when victims of disaster are especially vulnerable, and they might, in the course of pursuing their commercial interests, destroy evidence or otherwise impede a criminal investigation.

The Bureau, however, argues that the public is adequately protected by licensing requirements and by various sanctions which may be imposed against members of the insurance adjustment industry. Public adjusters and public adjuster solicitors are licensed by the Commonwealth, subject to revocation or suspension of their license, and bonded. They may not conduct business without a signed, written contract, and the form of the contract must be approved by the Insurance Commissioner. The statute requires that any contract secured by a public adjuster or public adjuster solicitor may be rescinded within four days of signing, and there are civil and criminal penalties for violation of any provision of the act, including provisions of the act which prohibit, inter alia, misrepresentation, misappropriation of money, or fraudulent practices. 63 P.S. §§ 1603–1608.

## II.

Because we agree with the Bureau that the portion of the statute about which they complain impermissibly burdens their right of free speech, we do not address the other

issues raised, but confine our discussion to the aspect of the case concerning the freedom of speech.

The First Amendment to the United States Constitution provides, in pertinent part:

Congress shall make no law ... abridging the freedom of speech, or of the press....

The Pennsylvania Constitution provides: ·

The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty....

Art. I, Sect. 7.

Because the United States Supreme Court has addressed problems relating to commercial speech in a series of opinions, our approach here will be to follow the minimum standards of analysis and substantive protection as required by that Court under the federal Constitution. Having completed our analysis based on federal minimum requirements, we will then consider whether the resolution of this particular case is more appropriately treated under the Pennsylvania Constitution or the United States Constitution.

In *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), the United States Supreme Court, for the first time, brought within the protection of the First Amendment a type of communication which it referred to as commercial speech.[2] In this case, a consumer group chal-

---

**2.** Although purely commercial speech was unprotected prior to 1976, there were indications as early as 1973 that this might change. In *Pittsburgh Press v. Human Relations Commission,* 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973) the Court upheld an ordinance prohibiting newspapers from advertising employment opportunities which were categorized by sex on the grounds that the discriminatory hirings proposed by the advertisements were illegal. While the Court acknowledged that the advertisements were "commercial speech," which was regulatable under the law at that time, it declined to uphold *the ordinance on that ground.*

Then in 1975 the Court took another step towards granting some First Amendment protection to commercial speech in a case in which

lenged a state law prohibiting pharmacists from advertising the price of prescription drugs.[3] The Court observed that speech does not lose its First Amendment protection because it is an advertisement, or because it appears in a format which is sold for profit, or because it solicits a purchase. *Id.* at 761, 96 S.Ct. at 1825, 48 L.Ed.2d at 358. Speech which does no more than propose a commercial transaction, according to the Court, "is not so removed from any 'exposition of ideas' and from truth, science, morality and arts in general ..." that it lacks all protection from the First Amendment. *Id.* This is so because the free flow of commercial information "is indispensable to the proper allocation of resources in a free enterprise system." *Id.* at 765, 96 S.Ct. at 1827, 48 L.Ed.2d at 360.

The Court also stated, however, that even though commercial speech is protected, it may be subject to some regulation. Time, place and manner restrictions have often been approved, provided that they are imposed without reference to the content of the speech, that they serve significant government interests, and that they leave open "ample alternative channels for communication of the information." *Id.* at 771, 96 S.Ct. at 1830, 48 L.Ed.2d at 364.

it struck down a Virginia statute which made illegal the circulation of a publication which encouraged abortion. In that case, a New York referral agency placed an ad in Virginia indicating that abortions were legal in New York and that its referral services were available. *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). In *Bigelow,* however, the issue of commercial speech was still not squarely before the court because the advertisement in question contained not only commercial information, but also noncommercial information of clear public interest which was entitled to First Amendment protection in its own right.

It was not until 1976, therefore, that the issue of purely commercial speech came squarely before the Court in *Virginia Pharmacy Board v. Virginia Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), where the issue was simply whether a pharmacist was entitled to advertise the prices of his prescription drugs.

**3.** The Court held that the consumer group had standing to challenge the statute because the protection afforded by the First Amendment "is to the communication, to its source and to its recipients, both.... If there is a right to advertise, there is a reciprocal right to receive the advertising, and it may be asserted by these appellees." *Id.* at 757, 96 S.Ct. at 1823, 48 L.Ed.2d at 355.

Additionally, the Court pointed out that false, misleading or untruthful speech does not enjoy First Amendment protection, and that the case at bar did not involve the special considerations pertinent to a case in which the proposed transactions or the advertisements themselves are illegal, nor did it involve the the electronic broadcasting media, which, again, requires a special analysis. *Id.* In fact, the issue involved in *Virginia Pharmacy* was simply:

> whether a State may completely suppress the dissemination of concededly truthful information about entirely lawful activity, fearful of that information's effect upon its disseminators and its recipients.

*Id.* at 772, 96 S.Ct. at 1831, 48 L.Ed.2d at 365. Because the prohibition was total, but without commenting on the applicability of its ruling to professions other than pharmacists, the Court held that the advertising ban was impermissible.

These fundamental ideas were reaffirmed seven years later in *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), a case involving a challenge to a federal statute which prohibited the mailing of unsolicited advertisements of contraceptives. Concerning the difference in levels of protection offered commercial and noncommercial speech, the Court stated:

> [A]s a general matter, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." With respect to noncommercial speech, this Court has sustained content-based restrictions only in the most extraordinary circumstances. By contrast, regulation of commercial speech based on content is less problematic. In light of the greater potential for deception or confusion in the context of certain advertising messages, content-based restrictions on commercial speech may be permissible. See *Friedman v. Rogers*, 440 U.S. 1, 59 S.Ct. 887, 99 L.Ed.2d 100 (1979) (upholding prohibition on use of trade names by optometrists).

463 U.S. at 65, 103 S.Ct. at 2879, 77 L.Ed.2d at 476 (foot-

notes and citations omitted).[4]

The *Bolger* Court also discussed the situation in which noncommercial information was joined together with advertising:

We have made clear that advertising which "links a product to a current public debate" is not thereby entitled to the constitutional protection afforded noncommercial speech. A company has the full panoply of protections available to its direct comments on public issues, so there is no reason for providing similar constitutional protection when such statements are made in the context of commercial transactions. Advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues.

463 U.S. at 68, 103 S.Ct. at 2881, 77 L.Ed.2d at 478 (footnotes and citations omitted).

■■■ Finally, the *Bolger* Court summarized the process of determining what protection is available for a particular instance of commercial speech:

"The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation." *Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York,* 447 U.S. [557] at 563, 100 S.Ct. 2343 [2350], 65 L.Ed.2d 341 [(1980)]. In *Central Hudson* we adopted a four-part analysis for assessing the validity of restrictions on commercial speech. First, we determine whether the expression is constitutionally protected. For commercial speech to receive such protection, "it at least must concern lawful activity and not be misleading." Id., at 566, 100 S.Ct. 2343 [2351], 65 L.Ed.2d 341. Second, we ask whether the governmental

4. This is consistent with the Court's statement in *Virginia Pharmacy,* supra, that although commercial speech may perform the important function of facilitating the flow of information, some regulation is permissible. See text, supra. *See also Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 638, 105 S.Ct. 2265, 2275, 85 L.Ed.2d 652, 664 (1985).

interest is substantial. If so, we must then determine whether the regulation directly advances the government interest asserted, and whether it is not more extensive than necessary to serve that interest. Ibid.

463 U.S. at 68–69, 103 S.Ct. at 2881, 77 L.Ed.2d at 478–79.[5]

Our first task, thus, is to determine whether the speech activity in this case is commercial or noncommercial; then we must apply the four-part test articulated in *Bolger*.

Perhaps there is no more difficult problem in the area of commercial speech than to define what distinguishes commercial from noncommercial speech. Justice Stevens points out in his concurring opinion in *Bolger* that "we must be

---

**5.** We note our agreement with the Bureau that in cases involving the constitutional challenge to a restriction on commercial speech which is not false or deceptive, "The party seeking to uphold a restriction on commercial speech carries the burden of justifying it." *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, n. 20, 103 S.Ct. 2875, n. 20, 77 L.Ed.2d 469, 480, n. 20. *See also Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652, 666, 670 (1985).

The Commonwealth claims, in effect, that some speech at issue in this case has been and might in the future be false or deceptive. There is no evidence, however, that public adjuster speech within twenty-four hours of a disaster is so pervasively false that contacts within this time frame could generally be characterized as false or deceptive. Every business activity is occasionally abused by dishonest individuals, but that does not make business activity generally false or deceptive. For these reasons, it is our view that the record does not support the claim that the speech at issue was false or deceptive, and since the case involves commercial speech, the Commonwealth should have had the burden of justifying the restriction on speech. Commonwealth Court, therefore, was in error in applying the traditional standard of review for constitutional challenges to statutes: viz., that "enactments of the General Assembly enjoy a strong presumption of constitutionality with all doubts resolved in favor of sustaining the constitutionality of the legislation."

If Commonwealth Court's analysis were accepted, it would have the effect of emasculating the four-part test just cited from *Bolger*. Future Pennsylvania courts handling commercial speech cases, therefore, should be careful to require the party seeking to uphold the restriction to justify it, and not, in this area at least, to apply any presumptions in favor of constitutionality. If the case involves a claim that the commercial speech activity in question is false or deceptive, the court must receive evidence on that issue and, depending on its determination as to whether falsehood and deception are involved, apply the appropriate standard of proof. If the court is satisfied that the speech in question is false or deceptive, then the usual presumption in favor of constitutionality of the regulation would apply.

wary of unnecessary insistence on rigid classifications, lest speech entitled to 'constitutional protection be inadvertently suppressed.'" 463 U.S. at 81, 103 S.Ct. at 2888, 77 L.Ed.2d at 487. Justice Stevens goes on:

I agree, of course, that the commercial aspects of a message may provide a justification for regulation that is not present when the communication has no commercial character. The interest in protecting consumers from commercial harm justifies a requirement that advertising be truthful; no such interest applies to fairy tales or soap operas. But advertisements may be complex mixtures of commercial and noncommercial elements: the noncommercial message does not obviate the need for appropriate commercial regulation ...; conversely, the commercial element does not necessarily provide a valid basis for noncommercial censorship.

*Id.*

In this case, as in *Virginia Pharmacy* and *Bolger*, the speech has both an informational and a commercial character. The informational aspect is that potential customers are customarily told something of the provisions of a typical insurance policy, of ways in which the insurance company's interest may not coincide with the interests of the policyholder, and of some actions which need to be taken under the typical policy to protect the policyholder's interests. The commercial aspect is that the public adjuster or the public adjuster solicitor is attempting to sell his services. A similar situation arose in *Bolger*, where informational pamphlets accompanied advertisements for contraceptives. One of these pamphlets, entitled "Condoms and Human Sexuality," referred to the seller's brand of condoms by name; the other, "Plain Talk About Venereal Disease," referred to condoms only generically except for a reference on the last page which identified the seller as a distributor of a particular brand of prophylactics. The Court concluded that although no single feature of the informational pamphlets may have compelled the conclusion that they were commercial, the combination of the fact that they were

conceded to be advertisements, that they made reference to a specific product, and that they were economically motivated supported the conclusion that the informational pamphlets were commercial speech. 463 U.S. at 66–67, 103 S.Ct. at 2879–80, 77 L.Ed.2d at 477–78.

■ In the present case, as in *Bolger*, the speech advertises the services of public adjusters as well as informs the potential customer; the speech makes reference to a particular service to be performed by the public adjuster; and it is economically motivated. Keeping in mind Mr. Justice Stevens' concern that commercial speech may not be so easy to distinguish from noncommercial speech in all cases, we conclude, as did the *Bolger* Court, that the speech at issue in this case is commercial.[6]

Next, under the four-part test mentioned earlier, our inquiry is whether the expression is constitutionally protected. As a threshhold matter, commercial speech deserving of constitutional protection must "concern lawful activity and not be misleading." The Commonwealth expresses the concern in this case that the speech at issue is misleading and that it may be used to perpetrate a fraud, particularly if it occurs immediately after a disaster, when the property owner may be vulnerable to overreaching. That some public adjusters and public adjuster solicitors may mislead potential customers does not, of course, establish that all persons in the public adjusting business commit fraud. In fact, in the absence of evidence that the overwhelming volume of public adjusting activity in Pennsylvania is based on misleading speech, we will treat public adjusting as a lawful business activity, just as we would any other business activity, which may be subject to abuse by a few individuals. *See* p. 1321, n. 5 supra. The solicitations involved in this case, therefore, are lawful activity which

6. For a discussion of problems associated with the classification of commercial and noncommercial speech, *See* Farber, "Commercial Speech and First Amendment Theory," 74 N.W.U.L.R. 372, 377 (1979).

have not been shown on this record to be pervasively misleading.[7]

Next, we must ask whether the governmental interest in regulation is substantial. It is self-evident that the protection of consumers from misleading and fraudulent business activity and the preservation of the scene of a disaster for criminal investigation are substantial governmental interests.

Having said this, however, we must determine whether the regulation directly advances the governmental interest and, lastly, whether it is not more extensive than necessary. Arguably, the ban on speech does advance the government's stated interest, for if there is no commercial speech activity, there cannot possibly be any fraud or misleading, but the real question is whether the regulation is more restrictive than it need be.

Because public adjusters and public adjuster solicitors are licensed and must satisfy the Insurance Commissioner that

---

7. The Commonwealth relies in part on *Ohralik v. Ohio State Bar Assn.,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978) to argue that the solicitations involved in this case should be regulatable. In *Ohralik* an attorney personally visited accident victims for the purpose of offering his professional services. As part of its rationale in upholding the Ohio restriction against such solicitations, the Court stated:

> Unlike a public advertisement, which simply provides information and leaves the recipient free to act upon it or not, in-person solicitation may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection. The aim and effect of in-person solicitation may be to provide a one-sided presentation and to encourage speedy and perhaps uninformed decisionmaking; there is no opportunity for intervention or counter-education by agencies of the Bar, supervisory authorities, or persons close to the solicited individual. The admonition that "the fitting remedy for evil counsels is good ones" is of little value when the circumstances provide no opportunity for any remedy at all.

*Id.* at 457, 98 S.Ct. at 1919, 56 L.Ed.2d at 454 (footnotes omitted).

While this statement of the evils of personal solicitation is compelling, it must be remembered that *Ohralik* involved the actions of an attorney. Because attorneys are often highly skilled and persuasive, because they owe a fiduciary duty to their clients, and because attorneys, as officers of the court, have traditionally been held to a standard of conduct that precludes the *appearance* of impropriety as well as actual impropriety, the restrictions of the *Ohralik* decision are not applicable here.

they will "transact business ... in such manner as to safeguard the interest of the public," 63 P.S. § 1602(6), and because conduct which indicates untrustworthiness may result in the revocation of the license, 63 P.S. § 1606(a)(1–13), it is our view that the regulation of misleading and fraudulent behavior may be more directly accomplished through the enforcement of anti-fraud provisions of the act than through the prior restraint of speech. Moreover, the public is protected by the fact that public adjusters and public adjuster solicitors must be bonded, by the fact that their sales contracts must be in a form approved by the Insurance Commissioner, and by the fact that any person entering into a contract with a public adjuster or public adjuster solicitor may rescind the contract within four days of signing. 63 P.S. § 1605.

Public adjusters and public adjuster solicitors may be fined or have their licenses suspended or revoked for a myriad of reasons, including "material misrepresentation of the terms and effect of any insurance contract; engaging in ... any fraudulent transaction with respect to a claim or loss ...; misrepresentation of the services offered or the fees or commission to be charged; conversion; violation of any rule promulgated under the act; and the commission of fraudulent practices. 63 P.S. § 1606(a)(1–13). Furthermore, a violation of any provision of the act shall be a misdemeanor and subject to a fine of $500 to $1,000 for each violation, 63 P.S. § 1607, and the provisions of the statute are supplementary to all other civil and criminal remedies. 63 P.S. § 1608(c). It is plain that persons who have been victimized by misleading speech of public adjusters or public adjuster solicitors have at their disposal a number of administrative, civil and criminal remedies. In light of this arsenal of remedies, it is our view that the imposition of prior restraints on the speech of public adjusters and public adjuster solicitors is unjustified.

The Commonwealth, of course, asserts that the restrictions involved in this case are only time, place and manner restrictions, since public adjusters and public adjuster solici-

tors are not banned altogether from soliciting business. Although it is true that the restriction in this case affects only twenty-four hours, the period of time immediately following the disaster may be the only time during which the property owner can be located before moving to an unknown address because of the disaster which has affected his property. Balancing the governmental interest of protecting persons who have just suffered the trauma of losing their property from potentially misleading speech of *some* public adjusters against that of the public adjusters and public adjuster solicitors in informing a likely prospect of the nature and value of their services, we find that the private business interests are more significant in light of the other remedies available, should there be fraud or misleading speech. In short, the Commonwealth's goals in this case are more appropriately accomplished through regulation of practices than through prior restraint of speech.

### III.

As we stated earlier, our approach in this case has been to follow the federal analysis as set out by the United States Supreme Court in order to determine whether the statute meets the minimum federal standards as required by that Court. It is axiomatic, of course, that the states, once they have complied with federal constitutional requirements, are free to impose their own more stringent requirements pursuant to their own constitutions.

The federal analysis requires that a court determine, ultimately, whether the regulation is more extensive than necessary to accomplish a legitimate, important governmental purpose. Fundamentally, this determination requires a balancing of the interests of government against those of the entity or individual whose speech has been regulated, and this balancing will depend upon the perspective of the balancer. Reasonable minds can disagree as to how extensive any given regulation should be with respect to its purpose, and the perspective of the United States Supreme Court on this issue may not be the same as that of a court

within a state jurisdiction. The differences of opinion may be based in part on differing jurisprudential theories of the function and responsibilities of government, but they may be based also on a regional, versus a national perspective.

Our perspective is that in the commercial speech area, we should tread carefully where restraints are imposed on speech if there are less intrusive, practicable methods available to effect legitimate, important government interests. Here, the balance of interests should be resolved in favor of the challenger because less intrusive methods were available to effect the governmental objectives.

We hold, therefore, that the Pennsylvania Constitution, Article I, Section 7, will not allow the prior restraint or other restriction of commercial speech by any governmental agency where the legitimate, important interests of government may be accomplished practicably in another, less intrusive manner. Since the legitimate governmental goals in this case could be accomplished by enforcement of civil, criminal and administrative remedies already in place, Commonwealth Court was in error in upholding the validity of the statute's restriction on speech.

The order of Commonwealth Court is reversed.

STOUT, J., did not participate in the consideration or decision of this case.