In the Matter of CONDEMNATION BY URBAN REDEVELOPMENT AUTHORITY OF PITTSBURGH of certain land in the 22nd Ward of the City of Pittsburgh, Allegheny County, Pennsylvania, Redevelopment Area 51 (Federal North) being property of New Garden Realty Corporation; A Pennsylvania Corporation; Its Administrators, Executors, Successors, Assigns or any other persons found to have any interest in the property,

Appeal of New Garden Theatre, Inc.

In the matter of Condemnation by Urban Redevelopment Authority of Pittsburgh of certain land in the 22nd Ward of the City of Pittsburgh, Allegheny County, Pennsylvania, Redevelopment Area 51 (Federal North) being property of New Garden Realty Corporation; A Pennsylvania Corporation; Its Administrators, Executors, Successors, Assigns or any other persons found to have any interest in the property,

Appeal of New Garden Realty
Corporation.

Commonwealth Court of Pennsylvania.

Argued Feb. 4, 2003.

Decided May 19, 2003.

Peter N. Georgiades, Pittsburgh, for appellant.

Joel P. Aaronson, Pittsburgh, for appellee.

BEFORE: SMITH–RIBNER, Judge, FRIEDMAN, Judge, and JIULIANTE, Senior Judge.

OPINION BY Judge SMITH–RIBNER.

The New Garden Theatre, Inc. (New Garden Theatre) and the New Garden Realty Corporation (New Garden Realty) appeal from two orders of the Court of Common Pleas of Allegheny County. The first, of June 24, 1999, dismissed preliminary objections filed by New Garden Theatre to the declaration of taking filed by the Urban Redevelopment Authority of Pittsburgh (URA) on May 9, 1997 in regard to a property owned by New Garden Realty at 12 W. North Avenue in the City. The second order, dated April 18, 2002, overruled remaining preliminary objections filed by New Garden Realty to the declaration of taking.

New Garden Theatre questions whether the trial court erred in barring a tenant in premises being taken by eminent domain from filing preliminary objections when it was not served with written notice of the declaration of taking. New Garden Realty states questions as follows: (1) whether a taking by eminent domain to replace one form of speech with another constitutes "content-based" official action; (2) whether the trial court erred by failing to decide whether the last adult theater in Pittsburgh would be able to relocate; (3) whether the First Amendment permits redevelopment officials to use eminent domain to control exhibitions at a theater, where their action is justified only by an unsupported theory that it will foster economic development; (4) whether local officials satisfied "intermediate scrutiny"

where they did not consider the impact of their actions upon speech and failed to consider alternative courses of action that would accomplish objectives without sacrificing speech rights; and (5) whether the trial court erred in not considering the condemnee's claim under Art. I, § 7 of the Pennsylvania Constitution after rejecting its First Amendment claim.

I

The subject property contains the Garden Theatre, a movie theater, which since the 1970s has been used as an "adult theater" as defined in the Pittsburgh Zoning Code. The trial court found that in the late 1960s the area near the intersection of Federal Street and North Avenue in the Central Northside District of Pittsburgh was considered to be a neighborhood in decline and in need of renewal. A January 1989 report by the City's Department of City Planning analyzed conditions in the eight-square-block area including rising crime, problem bars, declining population, loss of businesses and services and deteriorating and underutilized buildings. The report stated that the presence of an adult theater added to a negative image; it recommended certification of the area as blighted and eligible for redevelopment through the Urban Redevelopment Law, Act of May 24, 1945, P.L. 991, *as amended*, 35 P.S. §§ 1701–1719.2.

After a hearing the City Planning Commission certified the Federal North Redevelopment Area No. 51 (Redevelopment Area) as blighted in February 1989, and a team of planning participants was convened to begin preparations for a proposed redevelopment plan. The proposed goals of the redevelopment project included, inter alia, removing existing blight that had resulted in disinvestments and abandonment, encouraging new commercial investment and development and reinvestment in the housing stock and improving the area's appearance. Early in 1994 the new Mayor of Pittsburgh, Tom Murphy, appointed Deputy Mayor Tom Cox as Chairman of the URA. Cox sought a way to accelerate completion of the planning phase and transition to the implementation phase. He approached the founder and director of the Mattress Factory, a museum of contemporary art and a research and development laboratory for artists located a few blocks from the Redevelopment Area. The Mattress Factory agreed to participate in the planning and implementation process for the Garden Theatre Block.

In December 1995 the Pittsburgh City Council approved the Redevelopment Proposal for the Redevelopment Area, authorizing the URA to move forward with redevelopment activities, including the $5 million acquisition of all of the forty-seven properties that comprised the three contiguous blocks constituting the commercial core of the Redevelopment Area. The Mattress Factory submitted its master plan for the Garden Theatre Block to the URA in August 1996. Proposed reuses of the Garden Theatre included performing arts space for music, dance, film, special events and conferences; rental use by a wide range of for-profit and not-for-profit organizations; fund raising events and educational programming in conjunction with local businesses and universities; and periodic venue for Mattress Factory performance programming. The programming schedule was to tie into events such as the Children's Festival and the Three Rivers Arts Festival. The URA acquired forty-six properties amicably.

The URA filed a declaration of taking on May 9, 1997 to acquire title to the Garden Theatre. New Garden Realty filed preliminary objections, and the URA filed preliminary objections to the preliminary ob-

jections. In its order of October 29, 1997, the trial court granted in part and denied in part the URA's preliminary objections, thereby narrowing the issues. The parties then engaged in extensive discovery. On May 27, 1998, New Garden Theatre filed its preliminary objections, nearly identical to those filed by New Garden Realty, and by its order of June 24, 1999, the court struck the preliminary objections on the basis of laches. Following an extensive trial, the trial court by its order of April 18, 2002 dismissed the objections of New Garden Realty. The court found that New Garden Realty had not met its burden to prove that the URA acted in palpable bad faith by clear, precise and indubitable evidence, citing *Fleet v. Redevelopment Authority of County of Washington,* 147 Pa. Cmwlth. 169, 607 A.2d 311 (1992), which rejected similar objections, where the area met the criteria for designation as a blighted area and there was no formal agreement or indication of undue influence or bad faith.

The trial court also rejected New Garden Realty's objections based upon free speech concerns. The court noted that the right to display non-obscene, sexually explicit motion pictures and the right to see such movies are protected by the First Amendment to the United States Constitution and by Art. I, § 7 of the Pennsylvania Constitution. However, the court found that the taking was content-neutral, relying in part upon *Forty–Second Street Co. v. Koch,* 613 F.Supp. 1416 (S.D.N.Y.1985), where an adult theater owner claimed that the taking of his theaters, as part of an urban renewal project, was a prior restraint based upon hostility. The court in that case stressed that several hundred businesses in a thirteen-acre area were to be shut down, among them some adult uses, and the plaintiffs could not argue that their buildings were being singled out when whole blocks were being demolished

or taken for reuse. Similarly, in *G. & A. Books, Inc. v. Stern,* 604 F.Supp. 898 (S.D.N.Y.), *aff'd,* 770 F.2d 288 (2d Cir. 1985), the same court held that a renewal project for Times Square, which would displace many adult uses, did not constitute a prior restraint, regardless of the motivations behind the project, because it was not disputed that the area suffered from serious blight, and the protected speech was not singled out for special treatment.

Because the URA's action did not represent a content-based prior restraint on free speech, the trial court did not apply a strict scrutiny analysis to the taking. It applied instead the intermediate scrutiny standard set forth in *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672, 680 (1968): where governmental regulation has an incidental impact on protected speech, it is constitutional and sufficiently justified

> if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

The trial court concluded that the URA's condemnation of property for urban renewal is within its constitutional powers and that renewal and redevelopment of blighted areas constitute an important and substantial governmental interest that is unrelated to suppression of free expression. It quoted from *Forty–Second Street Co.* to the effect that it was beyond cavil that the area at issue suffered from extraordinary blight and that the project was an attempt to radically deal with it.

As to the fourth prong regarding the incidental restrictions on First Amendment freedoms, the trial court cited *United States v. Albertini*, 472 U.S. 675, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985). The Supreme Court stated there that an incidental burden on speech is no greater than is essential and therefore is permissible under *O'Brien* so long as the neutral regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulations. Further, the validity of such regulations did not depend upon a judge's agreement with a responsible decision-maker as to the most appropriate method for promoting those interests. The trial court found it clear that the URA's objective of redeveloping the area in general, and the preservation and redevelopment of buildings in the Garden Theatre Block in particular, would be achieved less effectively without acquiring the Theatre.[1]

## II

The Court turns first to the contention of New Garden Theatre that the trial court erred by barring a tenant from asserting preliminary objections in its own right, when the tenant never was served with written notice of the filing of the declaration of taking as required under Section 405 of the Eminent Domain Code (Code), Act of June 2, 1964, Special Sess., P.L. 84, *as amended*, 26 P.S. § 1–405, and an existing challenge to the taking was still at an early stage. Section 405(a) of the Code provides that within thirty days of the filing of the declaration of taking, the condemnor shall give written notice to the condemnee. Section 201(2) of the Code, 26 P.S. § 1–201(2), states: " 'Condemnee' means the owner of a property interest taken, injured or destroyed, but does not include a mortgagee, judgment creditor or other lienholder." Section 405(b) provides that the notice shall be served by any competent adult "in the same manner as a complaint or writ of summons in assumpsit or by certified or registered mail to the last known address of the condemnee" or, if such service cannot be made, then service shall be made by posting and publication. New Garden Theatre argues that this Court has held that where the Code specifies a method of service, such service is mandatory. *See City of Pittsburgh v. Haffner*, 80 Pa.Cmwlth. 53, 471 A.2d 116 (1984) (eminent domain statutes are among the types that are to be strictly construed).

New Garden Theatre also asserts that the trial court erred by applying the doctrine of laches. It cites *German v. City of Philadelphia*, 30 Phila. 513 (C.P.Pa.1995), *aff'd*, 683 A.2d 323 (Pa.Cmwlth.1996), where an owner petitioned for appointment of a board of viewers for a de facto taking some seventeen years after the demolition of a building. The trial court stated that although the elements of laches had been established, i.e., there was inexcusable delay and the city was prejudiced by that delay, laches is an equitable de-

---

1. The trial court noted that the parties raised arguments based upon *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986), where the Supreme Court held that the *O'Brien* test and the First Amendment were not implicated when a bookstore was closed under a public health statute of general applicability that imposed sanctions on non-expressive activity. The court declined to decide that issue in light of its intermediate scrutiny decision.

This Court's review is limited to determining whether the trial court abused its discretion or committed an error of law; in a case under the Urban Redevelopment Law the Court must see that the authority has not acted in bad faith or arbitrarily, that it has followed statutory procedures in preparing a plan and that there are no constitutional violations. *In re Condemnation of 110 Washington Street*, 767 A.2d 1154 (Pa.Cmwlth.2001).

fense, which was not available when the court was not sitting in equity. Also, in *Crawford Central School Dist. v. Pennsylvania Labor Relations Board*, 152 Pa. Cmwlth. 277, 618 A.2d 1202 (1992), the Court stated that it was improper for a trial court hearing an appeal to raise the defense of laches sua sponte. Finally, New Garden Theatre argues that its rights to due process of law were denied because it was not allowed to be heard. It cites *Sharp v. Valley Forge Medical Center & Heart Hospital, Inc.*, 422 Pa. 124, 221 A.2d 185 (1966), and *Frycklund v. Way*, 410 Pa.Super. 347, 599 A.2d 1332 (1991), among others, for the proposition that rules governing service must be strictly followed and that knowledge of a pending action does not make defective service effective.

The URA notes that Section 406(a) of the Code, 26 P.S. § 1–406(a), provides that a condemnee shall file preliminary objections within thirty days of being served with notice of condemnation. The URA emphasizes that it is not disputed that New Garden Theatre and New Garden Realty are both 100 percent owned by George Androtsakis, who is also the president, the sole officer, the sole board member and the sole manager of both entities; however, the lease between them was not recorded. New Garden Theatre admitted that it had actual notice of the URA's declaration of taking no later than May 20, 1997, and Androtsakis directed the filing of preliminary objections by New Garden Realty at that time.

The URA relies upon *City of McKeesport v. Delmar Leasing Corp.*, 656 A.2d 180 (Pa.Cmwlth.1995), where a property owner and a mortgagee corporation had the same president and the same secretary and proper notice of a tax sale to the owner was admitted. Further, the URA cites *O.S.C. Co. v. Lackawanna River Basin Sewer Authority*, 121 Pa.Cmwlth. 570, 551 A.2d 376 (1988), in which the Court cited *Avery v. Commonwealth*, 2 Pa. Cmwlth. 105, 276 A.2d 843 (1971), for the holding that nonprejudicial irregularities pertaining to procedural aspects of condemnation would not invalidate a taking. Similarly, in *Appeal of Perry*, 75 Pa. Cmwlth. 343, 461 A.2d 916 (1983), the Court, citing *Avery*, rejected a claim of failure of service because a wife signed for separate notice sent to a husband, noting that the appellants were not misled and were fully aware of the condemnor's intentions. New Garden Theatre responds that in *Appeal of Perry* and *Avery* there was some attempt at service and the defect was not raised until after the merits adjudication.

■ The Court agrees that the doctrine of laches does not apply in this action at law and that the trial court erred in raising it sua sponte. Nonetheless, the rule of *City of McKeesport, Avery, Appeal of Perry* and *O.S.C.* applies here. Unlike the situation in *Pocono Pines Corp. v. Board of Property*, 10 Pa.Cmwlth. 466, 310 A.2d 719 (1973), *vacated on other grounds sub nom. Pocono Pines Corp. v. Pennsylvania Game Commission*, 464 Pa. 17, 345 A.2d 709 (1975), New Garden Theatre's interest could not be discovered by a search of tax and property records because it was not recorded. Nevertheless, in the peculiar circumstances of this case, written notice of the condemnation was received by the person who was the owner, the president and the sole officer, board member and manager of both entities, which was sufficient to trigger the duty to file preliminary objections.

### III

■ On free speech issues the Court turns first to the argument advanced by the URA that this case is governed by the

rule of *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986).[2] In *Arcara* an undercover investigator witnessed illegal sexual activity in an adult bookstore within view of the proprietor, and he was solicited for prostitution. A civil complaint resulted in an order closing the store for one year under provisions of a public health statute that authorized the closing of a building used for prostitution and lewdness. The Supreme Court noted the crucial distinction from other First Amendment cases that the sexual activity proscribed involved no element of protected expression. It held that "neither the press nor booksellers may claim special protection from governmental regulations of general applicability simply by virtue of their First Amendment protected activities." *Arcara*, 478 U.S. at 705, 106 S.Ct. at 3176, 92 L.Ed.2d at 577. In a footnote the court explained that the order was not a prior restraint because the respondents were "free to carry on their bookselling business at another location, even if such locations are difficult to find," and the order had nothing to do with any expressive conduct. *Id.* at 705 n2, 106 S.Ct. at 3177 n2, 92 L.Ed.2d at 577 n2.

This Court applied *Arcara* in *Commonwealth ex rel. Preate v. Danny's New Adam & Eve Bookstore*, 155 Pa.Cmwlth. 281, 625 A.2d 119 (1993), which upheld an injunction against video booth and dance area uses of adult stores that were used for illicit sexual activity creating public health dangers under a statute declaring any building used for lewdness and prosti-

tution to be a common nuisance. In *Thiry v. Carlson*, 887 F.Supp. 1407 (D.Kan.1995), aff'd, 78 F.3d 1491 (10th Cir.1996), the court analyzed a claim of a First Amendment violation where the state proposed to condemn property for a road project that included a gravesite sacred to the owners, and it stated that the plaintiffs had failed to show that laws which conferred authority on the state to act, i.e., granting condemnation authority, were anything other than neutral laws of general applicability.

On the merits of this point New Garden Realty argues that under *Arcara* the activity restrained must have no expressive element and the official restraint must be "generally applicable" rather than selectively applied. In its view, the admitted motive of the URA officials to change the use of the building from the current use to a venue for performing arts, cultural and community activities (with a ban on pornographic uses) to increase the possibility of marketing other buildings in the area shows that expressive conduct is being restrained. Further, it contends that *Arcara* and other cases have referred to laws that restrain all persons at all times as "regulations of general applicability," such as fire codes and requirements for sewage treatment. However, a distinction is maintained as to laws whose application is based upon "individualized assessments" by officials, such as zoning regulations governing applications for conditional use permits.[3]

**2.** New Garden Realty asserts that the question of the applicability of *Arcara* to the present case is not properly before the Court because the URA did not file a cross-appeal from the trial court's order, citing *Sateach v. Beaver Meadows Zoning Hearing Board of Appeals*, 676 A.2d 747 (Pa.Cmwlth.1996) (where an appellee addresses an issue not raised by the appellant or addressed in a cross-appeal, the issue is deemed waived). Here, however, the overarching issue is whether the URA's taking

of the Garden Theatre violates the First Amendment or Art. I, § 7. The URA's argument that the First Amendment does not apply is within the scope of that debate. The URA has argued *Arcara* to the Court, and New Garden Realty has responded on the merits.

**3.** New Garden Realty also argues that the Pennsylvania Supreme Court rejected *Arcara* analysis in *Pap's A.M. v. City of Erie*, 571 Pa. 375, 812 A.2d 591 (2002) (*Pap's II*), when the

The Court agrees that the First Amendment issue may be disposed of under *Arcara*. The Urban Redevelopment Law is a law of general applicability that empowers authorities such as the URA to combat blight and to promote economic redevelopment. *See* Section 2 of the Urban Redevelopment Law, 35 P.S. § 1702. Where a determination of blight has been made, the URA is empowered to propose remedies, and the power of eminent domain is one tool that it may use to implement its proposals. *See* Sections 9(i), 12 and 12.1, added by Section 2 of the Act of June 23, 1978, P.L. 556, 35 P.S. §§ 1709(i), 1712 and 1712.1. Under *Arcara* the URA's exercise of a generally applicable power to use eminent domain to combat blight did not transform the taking into a "time, place and manner" restriction on free speech.

## IV

Notwithstanding the above conclusion, the Court deems it proper to consider New Garden Realty's other First Amendment arguments. New Garden Realty first argues that the trial court in rejecting strict scrutiny review failed to address whether the taking of the Garden Theatre will leave ample alternative avenues for communication of films with adult themes, which was one of New Garden Realty's principal contentions. New Garden Realty asserts that its present use will be destroyed if it is ousted from the Garden Theatre. There is a concern for the right of each person to be free to express and to be heard but also a corollary right of the public to access. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,*

425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). This right of access has been extended to viewing of adult films. *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975).

The United States Supreme Court has stated that the First Amendment requires that a city refrain from effectively denying persons a reasonable opportunity to operate an adult theater in the city, even where a "content-neutral" regulation restricting locations is involved. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). In *Forty–Second Street Co.* the court stated that government may no more effect an unconstitutional purpose through eminent domain than through zoning, injunctions, criminal prosecutions or other methods. The court's decisions in that case and in *G. & A. Books, Inc.* were based in part on a finding that availability of sexually explicit material in the midtown area would not be severely affected because several dozen adult uses would remain within blocks of the project area. New Garden Realty asserts that the trial court failed to resolve a factual dispute as to the availability of alternative sites.

New Garden Realty also contends that strict scrutiny review applies because the URA's stated purpose in precluding adult films from the Redevelopment Area is to change the "negative image" that, in its opinion, results from showing adult films. Strict scrutiny must be applied to any form of government action that suppresses, disadvantages or burdens speech because of its content.

court noted that Justices Scalia and Thomas concurred with the judgment in *City of Erie v. Pap's A.M.*, 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000), because they thought that an ordinance banning public nudity did not raise a question of protected expression at all, and the court stated that this position found

no support in this state's jurisprudence. However, the Pennsylvania court did not reject *Arcara* analysis per se but rather its application to a ban on public nudity that the court deemed to be aimed at prohibiting nude dancing, which the court held was a form of expressive conduct.

*Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). The URA responds, among other things, that the proposal is to preserve and restore all the buildings at a cost of $12.4 million and that the Garden Theatre building is the largest and most centrally located on the block and its acquisition is necessary to insure URA site control. Although there is evidence that some participants in the planning process believed that the adult theater added to the negative image, the only direct evidence of the URA's view was its acknowledgement that the general perception that the Garden Theatre was part of the negative image was a factor in the URA's decision not to include *new* adult uses, along with bars and other uses, in the list of permitted uses contained in Section 6.2.1 of the Redevelopment Plan.

The URA argues that where government action does not on its face regulate speech, the burden is on the challenger to prove an intent to suppress content. In *City of Renton* the Supreme Court reversed the invalidation of a zoning ordinance that restricted the location of adult theaters. The court concluded that the ordinance was a content-neutral time, place and manner regulation. In *Forty–Second Street Co.* the court noted the plaintiffs' reference to many hostile comments toward their films that were scattered throughout the documentation for the renewal project but pointed out that several hundred businesses would be closed in a neutral fashion. The court stated that "mere hostility to speech which will be incidentally burdened by a Project that has other primary purposes is insufficient...." 613 F.Supp. at 1425. The URA has articulated several bases for acquiring the theater unrelated to content of speech, and the Court agrees that under *O'Brien, City of Renton* and similar cases, the trial court did not err in concluding that the

URA action should not be subjected to strict scrutiny as a content-based restriction on First Amendment rights.

V

■ New Garden Realty next argues that the trial court erred in holding that the URA's action satisfied intermediate scrutiny. It again cites *City of Renton,* 475 U.S. at 47, 106 S.Ct. at 928, 89 L.Ed.2d at 37, where the Court held that "so-called 'content-neutral' time, place and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." New Garden Realty asserts that the trial court's failure to decide whether ample alternative means of communicating adult exhibitions remain precludes a finding that intermediate scrutiny was satisfied. The URA responds that assuming intermediate scrutiny applies, the trial court did not err or abuse its discretion in determining that it was met. The URA contends that it is beyond dispute that its goal of redeveloping the Redevelopment Area would be achieved less effectively without the taking, citing *Albertini.*

The URA argues that a specific finding that this taking would not unreasonably limit alternative avenues of communication was not required. First, unlike a regulation prohibiting nude dancing generally or restricting the locations of adult theaters, the taking of a single property has no effect on other alternative avenues of communication. Further, New Garden Realty admitted that alternative means of viewing adult movies such as rental or purchase at video stores are available. In *Golden Triangle News, Inc. v. Corbett,* 689 A.2d 974 (Pa.Cmwlth.1997) (*Golden Triangle I* ), the Court pointed out that if patrons of adult stores did not wish to view videos in the

well-lit and visible booths required by statute, they had the alternative of renting them and watching them at home.

The Court agrees that the intermediate scrutiny test was met in this case. The first three prongs of the *O'Brien* test are clearly met. Although New Garden Theatre makes much of its status as the last adult theater within the City of Pittsburgh, the taking of its building for redevelopment purposes does not necessarily eliminate reasonable alternatives of communication. In *City of Renton* the Supreme Court stated that "we have never suggested that the First Amendment compels the Government to ensure that adult theaters, or any other kind of speech-related businesses for that matter, will be able to obtain sites at bargain prices." *Id.*, 475 U.S. at 54, 106 S.Ct. at 932, 89 L.Ed.2d at 42. The court further stated that the First Amendment required only that the city refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city, and the ordinance easily met that requirement. The record here contains written testimony of private investigator Jerry Mailzech detailing locations in and around the City that feature adult materials, including some with booths, and places where videos may be rented. The Court is satisfied that the record amply shows that access to the type of materials featured at the Garden Theatre will not be curtailed under the taking.

## VI

Finally, New Garden Realty argues that, assuming the URA's action would satisfy First Amendment criteria, the trial court abused its discretion in failing to analyze independently the New Garden Realty's claims under Art. I, § 7 of the Pennsylvania Constitution.[4] The URA argues that where a particular restriction of speech is determined not to be a content-based restriction or a prior restraint, Art. I, § 7 does not require a different or more strict standard of review than is required for time, place and manner restrictions under the First Amendment, which is the review that the trial court has already performed. In *Golden Triangle I* and in *Golden Triangle News, Inc. v. Corbett*, 700 A.2d 1056 (Pa.Cmwlth.1997) (*Golden Triangle II*), *aff'd sub nom. Golden Triangle News, Inc. v. Fisher*, 553 Pa. 71, 717 A.2d 1023 (1998), this Court stated that the "least restrictive" standard set forth in *Insurance Adjustment Bureau v. Insurance Commissioner*, 518 Pa. 210, 542 A.2d 1317 (1988), did not apply to that case, involving only time, place and manner restrictions.

In its reply brief New Garden Realty relies heavily upon *Pap's A.M. v. City of Erie*, 571 Pa. 375, 812 A.2d 591 (2002) (*Pap's II*), which was decided December 19, 2002, after the trial court's decision. In *Pap's A.M. v. City of Erie*, 553 Pa. 348, 719 A.2d 273 (1998) (*Pap's I*), *rev'd and remanded*, 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000), the Pennsylvania Supreme Court relied on a First Amendment analysis and concluded that a blanket ban in an ordinance against appearing in public in a state of nudity was a content-based restriction aimed at nude dancing in certain establishments, which did not survive strict scrutiny. The United States Supreme Court reversed. A plurality concluded that the restriction was a content-

---

**4.** Article I, § 7 provides: "The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty." In *Insurance Adjustment Bu-*

*reau v. Insurance Commissioner*, 518 Pa. 210, 542 A.2d 1317 (1988), the court stated that it would first consider minimum commercial speech standards under the First Amendment and then consider whether resolution was more appropriately treated under Art. I, § 7.

neutral time, place and manner regulation that passed muster under intermediate scrutiny.

On remand, the Pennsylvania Supreme Court agreed that nude dancing is expressive conduct that is subject to protection under Art. I, § 7, which is broader than that under the First Amendment. The court reaffirmed its conclusion in *Pap's I* that the ordinance was an obvious attempt to burden expression itself. It held independently under Art. I, § 7 that an intermediate level of scrutiny is inappropriate when expressive conduct such as nude dancing is involved. The court adopted a "unitary standard" for such cases as it had in *Insurance Adjustment Bureau*, involving commercial speech, which invalidated a statute that barred certain insurance professionals from soliciting victims of catastrophes for twenty-four hours. The court stated that "regulations aimed at barring nude dancing, no less than regulations of protected commercial speech, require that we 'tread carefully where restraints are imposed ... if there are less intrusive, practicable methods available to effect legitimate, important government interests.'" *Pap's II*, 571 Pa. at 410, 812 A.2d at 612 (quoting *Insurance Adjustment Bureau*, 518 Pa. at 225, 542 A.2d at 1324). Because the legitimate government interest in deterring sex crimes could be accomplished by less restrictive means than barring nude dancing, the court held the ordinance unconstitutional.

New Garden Realty concludes that *Pap's II* means that in any case in which communication within the contemplation of Art. I, § 7 is involved, intermediate scrutiny may not be applied; rather the proper standard is the "least restrictive means" test. Also, it states that even where officials assert a legitimate motive, a concurrent motive to restrict speech raises a constitutional issue, and when the record demonstrates an intent to restrict adult films in the area, the burden is on the government to show there is no less intrusive, practicable method available to effect legitimate, important governmental interests. Here officials never considered alternatives that would be less destructive of protected speech and less restrictive than taking the theater from its owner.

■ The Court disagrees. First, neither *Pap's II* nor the cases discussed therein address an *Arcara*-type situation. The Court sees no reasoning in *Pap's II* that is contrary to the sensible rule of *Arcara* that persons may not claim special protection from governmental regulations of general applicability simply by virtue of their free speech activities. The Court believes that *Pap's II* does not require a "least intrusive means" analysis, or indeed any free speech analysis, where enforcement of a law of general applicability such as a fire code has some effect on speech. As noted above, the Court regards the multi-million dollar project to redevelop a blighted area as the exercise of general statutory authority for the public welfare.

■ In addition, if the Art. I, § 7 "least intrusive means" review is applied, the Court is convinced that the test is satisfied. The record indicates that the redevelopment plan was arrived at after years of study. The URA determined in its expertise that correcting the certified blight would require acquisition of all the properties in the three-block area and their reuse according to a coordinated overall plan. The multiple uses proposed for the Garden Theatre property were central to the overall plan of development. The only alternative to acquiring the Theatre was not acquiring it and permitting it to continue as is, but the governmental interest of redevelopment of a large blighted area would have been seriously undermined or destroyed if that alternative had

been pursued. Hence, the least intrusive means for accomplishing a legitimate governmental interest was employed. Because the trial court did not err or abuse its discretion, its order is affirmed.

## ORDER

AND NOW, this 19th day of May, 2003, the order of the Court of Common Pleas of Allegheny County is affirmed.

Concurring and Dissenting Opinion by Judge FRIEDMAN.

I respectfully concur and dissent. I agree with the majority that: (1) the receipt of written notice of condemnation by the owner of the New Garden Theatre, Inc. (New Garden Theatre) triggered a duty to file preliminary objections, (majority op. at 1092); (2) under federal law, the condemnation is not subject to strict scrutiny as a content-based restriction on free speech rights under the First Amendment, (majority op. at 1095); and (3) the condemnation satisfies the four-prong intermediate scrutiny test set forth in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), (majority op. at 1096). Despite my agreement on these issues, I disagree with the majority that: (1) the U.S. Supreme Court's decision in *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986), is applicable here, (majority op. at 1093–94); and (2) the condemnation does not violate the right to free expression guaranteed by Article I, Section 7 of the Pennsylvania Constitution, (majority op. at 1097–98).

On May 9, 1997, the Urban Redevelopment Authority of Pittsburgh (URA) filed a declaration of taking to acquire title to the New Garden Theatre, an "adult" movie theater located in a blighted area designated the Federal North Redevelopment Area

No. 51 (Redevelopment Area). The URA took the Garden Theater by eminent domain under the Urban Redevelopment Law[1] because the presence of an "adult" movie theater added to the negative image of the Redevelopment Area. (Trial court op. at 3.) Instead of showing "adult" movies at the New Garden Theatre, the URA planned to use the theater for presentations of the performing arts, for special events and for the showing of "non-adult" films.

New Garden Realty Corporation (New Garden Realty), which owns the theater, filed objections to the taking, which the trial court overruled. The matter is now on appeal to this court.

## I. Applicability of Arcara

Although the trial court found it unnecessary to decide whether the U.S. Supreme Court's decision in *Arcara* is applicable here, (*see* trial court op. at 24), the majority affirms the trial court's decision based on *Arcara*. For the following reasons, I conclude that *Arcara* does not apply here.

In *Arcara* a state public health law provided for closure of any building found to be a public health nuisance, which is defined in the law to include a place of prostitution and lewdness. When a law enforcement officer observed instances of prostitution and lewd activity at an "adult" bookstore, a civil complaint was filed against the bookstore seeking its closure under the public health law. The bookstore owner argued that the closure would interfere with the First Amendment right to sell "adult" books. The U.S. Supreme Court rejected that argument, holding that the First Amendment is not implicated by the enforcement of a public health law of general application against a store which

---

1. Act of May 24, 1945, P.L. 991, *as amended,* 35 P.S. §§ 1701–1719.2.

happens to sell books. *Arcara.* The Court explained that the public health law was directed at "unlawful activity" having nothing to do with the books and that the First Amendment could not be used as a "cloak for obviously unlawful public sexual conduct." *Id.* at 705, 707, 106 S.Ct. 3172.

Here, the URA did *not* take the New Garden Theatre by eminent domain under the Urban Redevelopment Law because it was a place of unlawful activity and, thus, constituted a public nuisance.[2] The URA took the New Garden Theatre only because the theater's *lawful* showing of "adult" movies added to the negative image of the Redevelopment Area. Because the Urban Redevelopment Law, as applied in this case, is *not* directed at general unlawful activity that constitutes a public nuisance but, rather, is specifically directed at the "adult" movie theater and its secondary effects on the neighborhood, *Arcara* simply does not apply.[3]

## II.   Article I, Section 7

Although the trial court did not consider whether the URA's taking of the New Garden Theatre violated the right to free expression guaranteed by Article I, Section 7 of the Pennsylvania Constitution, the majority affirms the trial court's decision based on Article I, Section 7. Unlike the majority, I conclude that Article I, Section 7 requires reversal of the trial court's decision.

Article I, Section 7 of the Pennsylvania Constitution provides: "The free communication of thoughts and opinions is one of the invaluable rights of [people], and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty." Pa. Const., Art. I, § 7. This guarantee is broader than the guarantee of free speech in the First Amendment. *Pap's A.M. v. City of Erie,* 571 Pa. 375, 812 A.2d 591 (2002) (*Pap's II* ). In fact, during its long legal history, Pennsylvania has forged its own path, independent of the federal government, in analyzing issues involving free expression. *See id.*

In considering Article I, Section 7 in this case, the first question is whether the URA's taking of the New Garden Theatre is content-based, i.e., based on the theater's showing of "adult" films, or whether the taking is content-neutral. *Id.* To make this determination, it is necessary to examine both the stated and the unmentioned purposes of the taking. *Id.* Where the stated purpose of a government action is inextricably bound up with the suppression of protected expression, the government action is content-based. *Id.*

Here, the URA took the New Garden Theatre because the presence of an "adult" theater added to the negative image of the Redevelopment Area. Thus, an unmentioned purpose of the taking was to eliminate the showing of "adult" movies in the Redevelopment Area. As indicated above,

**2.** I note that section 12.1(c)(1) of the Urban Redevelopment Law, 35 P.S. § 1712.1(c)(1), defines blighted property to include any premises which, because of its use, is a public nuisance at common law. However, our supreme court has held that showing "adult" movies does not constitute a public nuisance at common law. *Commonwealth v. MacDonald,* 464 Pa. 435, 347 A.2d 290 (1975). Therefore, as a matter of law, the New Garden Theatre's showing of "adult" films does not constitute a public nuisance.

**3.** In her concurring opinion, Justice O'Connor, joined by Justice Stevens, stated that if a city were to close an "adult" bookstore "because of the perceived secondary effects of having a purveyor of such books in the neighborhood, the case would clearly implicate First Amendment concerns...." *Arcara,* 478 U.S. at 708, 106 S.Ct. 3172 (O'Connor, J., concurring).

the URA planned to continue showing films at the New Garden Theatre, but not "adult" films. Of course, this means that the URA's stated purpose for taking the New Garden Theatre is inextricably bound up with the suppression of protected expression, making the URA's action content-based.

Because the URA's taking of the New Garden Theatre was content-based, it is subject to strict scrutiny under Pennsylvania law. *Id.* To pass the strict scrutiny test, a government entity must show that its action is narrowly drawn to accomplish a compelling governmental interest. *See Pap's A.M. v. City of Erie,* 553 Pa. 348, 719 A.2d 273 (1998) (*Pap's I*). If the government entity can achieve its goal by less restrictive means, the government's burden on protected expression is not constitutional. *Pap's II.*

After considering the facts before us here, I conclude that the URA failed to prove it had a *compelling* interest in taking the New Garden Theatre. The URA's interest in taking the New Garden Theatre was to improve the negative image of the Redevelopment Area. However, the facts are these: (1) the Redevelopment Area had been in decline and in need of renewal since the late 1960's; (2) the New Garden Theatre has shown "adult" films since the 1970's;[4] (3) the redevelopment process did not begin until 1989; and (4) the URA's declaration of taking was not filed until 1997. Certainly, if the government had a *compelling* interest in improving the decades-old negative image of the Redevelopment Area, the government would have been compelled to take action before 1997. Absent a compelling government interest,

the URA's taking of the New Garden Theatre fails the strict scrutiny test.

Even if I were to conclude that improving a neighborhood's image is a compelling government interest, I would not conclude that the URA's taking of the New Garden Theatre was the least restrictive means of accomplishing that purpose. For example, it is apparent that the URA's plans for the other properties taken in the Redevelopment Area will improve the negative image of the Redevelopment Area without burdening free expression. Moreover, if the Redevelopment Area needs a different kind of theater to stimulate the renewal of the neighborhood, the URA can support the construction of such a theater elsewhere in the area.[5] Considering that there are less restrictive means to accomplish the URA's goal which do not suppress protected expression, I would conclude that the URA's taking of the New Garden Theatre fails the strict scrutiny test for that reason.

Because I believe that the URA's taking of the New Garden Theatre violates the right to free expression guaranteed by Article I, Section 7 of the Pennsylvania Constitution, I would reverse.

---

4. Given the fact that the area was blighted in the 1960's, it is apparent that the showing of "adult" films in the neighborhood did *not* cause the area's blight.

5. Perhaps New Garden Realty will decide to change its use of the New Garden Theatre to accommodate a different clientele after redevelopment is complete.